Curtis *v.* Leavitt.

New trial granted.

[NEW-YORK GENERAL TERM, December 5, 1853. *Edmonds, Edwards* and *Mitchell*, Justices.]

LEWIS CURTIS, JOHN L. GRAHAM and RICHARD M. BLATCH-FORD, trustees, *vs.* DAVID LEAVITT, receiver of the North American Trust and Banking Company, JOHN HORSLEY PALMER, JAMES MACKILLOP and THOMAS DENT.

DAVID LEAVITT, receiver of the North American Trust and Banking Company, *vs.* RICHARD M. BLATCHFORD, LEWIS CURTIS and JOHN L. GRAHAM, JOHN HORSLEY PALMER, JAMES MACKILLOP, and THOMAS DENT, and others.

Joint stock associations, formed by articles of copartnership, entered into and registered according to the free banking law, although possessed, like other partnerships, of certain corporate attributes, are not corporations within the meaning of that provision of the late constitution of the state which prohibited the legislature from "·creating any body politic or corporate" without a two-thirds vote in each particular case.

Although legislative enactments of an ordinary remedial or directory character, in reference to corporations, as such, may, perhaps, be applicable to such associations, yet provisions creating misdemeanors and imposing penalties and forfeitures, cannot be so extended by implication, without violating a fundamental rule in the interpretation of statutes, and virtually enacting an *ex post facto* law by judicial legislation.

Curtis *v.* Leavitt.

The act of May, 1840, (*Laws of* 1840, *ch.* 363,) which extended *one* of the previous penal regulations for the government of moneyed corporations to the free banks making it a misdemeanor for them to issue bills or notes on time or interest, was in effect a legislative assertion, binding on the judiciary, that such regulations did not previously apply, and that none, except the particular one so expressly selected should thereafter apply, to the free banks. And the whole series of subsequent enactments is in conformity with this exposition.

The North American Trust and Banking Company had power to borrow money to the extent of its actual and lawfully authorized capital, as a necessary incident of banking, and as resulting, by necessary implication, from the express power, unrestricted, to receive deposits, to sell exchange, to buy gold and silver coin, and to issue and redeem a circulating medium, payable on demand, while the funds specially appropriated for its security were by law placed beyond the control of the institution issuing it.

Accordingly *held*, that the bonds and other obligations of the company, given as evidence of such loans, and the trust mortgages collateral to them, unless otherwise impeached, were valid instruments.

The statute of 1830, (1 *R. S.* 591,) prohibiting corporations when insolvent or in contemplation of insolvency, from making assignments, with the intent of giving preferences to particular creditors; and declaring every violation of such prohibition to be a misdemeanor; has no application to the North American Trust and Banking Company, nor to the deeds of trust executed by it to Blatchford and others.

That association was not insolvent at the time it executed the deeds of trust or mortgages to Blatchford and others, called the *Million* and *First Half Million Trusts*; nor did it make those assignments in contemplation of insolvency. And the trust deeds were not executed with the intent of creating a preference, but to obtain further indulgence and larger advances, and to enable the company by cash means to pay all its debts, and to transact a business more profitable to its stockholders.

The statute which declares that conveyances and assignments of personal property "made in trust for the use of the person making the same," shall be void as against creditors, has no application to trust mortgages made *bona fide* to *raise money* to pay creditors. And this although the surplus, after satisfying the mortgage debts is, by way of resulting trust, or by express stipulation, to be for the use of the mortgagor.

The provision in the same statute, declaring that every assignment of "goods and chattels," by way of mortgage, unless accompanied by an immediate delivery, and followed by "an actual and continued change of possession of the things mortgaged or assigned," shall be presumed to be fraudulent, applies only to goods and other things of which *possession* can properly be predicated, and not to what the law denominates *things in action*, as contradistinguished from things in possession.

The deeds of trust, or mortgages, executed by the North American Trust and Banking Company to Blatchford and others, called the *Million and First Half*

Curtis *v.* Leavitt.

*Million Trusts* were not made with the intent to delay, hinder, or defraud creditors.

No board of directors, nor any board analogous to a board of directors, being required by law for the free banks, the provisions of the revised statutes forbidding the making of certain transfers by any moneyed corporation without the sanction of a previous resolution of its *board of directors* or managers, is inapplicable to a bank organized under the general banking law.

The trust mortgages, or deeds of trust, above · mentioned, were sufficiently sanctioned or ratified by the association, or by the persons whom the association appointed or allowed to have the direction and management of its affairs, if any ratification was necessary.

The bonds issued upon, and secured by, the trust mortgages, of the North American Trust and Banking Company were sufficiently sealed, although the seal of the association was not impressed on wax or wafer, but stamped into the texture of the paper. At all events they were not "bills or notes," within either the letter or the meaning of the act of 1840.

The true construction of the act of 1840 is that the "issue and circulation" thereby intended to be prohibited, was that of bank notes proper; or of notes which were likely to enter into, and being on time or interest, to affect injuriously the circulating medium of the state. Notes, therefore, to come within the prohibition, must not only be on time or interest, but in the similitude of bank notes, or adapted for circulation *as money.*

Certificates of deposit issued by a bank in the city of New-York, payable with interest in Philadelphia, are not "bills or notes issued, or put into circulation," within the meaning of the act of 1840; not being issued as money, nor adapted to circulate as money, in this state or elsewhere.

Bonds issued in this state, payable in England, and in English coin, are not usurious, though sold under par in England.

Where a party pays the debt of another, at his request, although the debt be void for usury or any like cause, it is no defense against the claim of the party making the advance, to be refunded.

A loan made in good faith to a banking association of this state, by banks in another state, on suspended bank notes, returnable by tacit understanding, in the like currency, although the borrower immediately sells the notes, for specie, at a discount, is not usurious; and the lender has a valid claim for repayment in similar notes or their equivalent in specie.

No receiver of any corporation, or of any free banking association, since the act of 1850, (*Laws of* 1850, *ch.* 172,) can plead, or set up, or prove, or in any manner interpose the defense of usury. And the act, being in the nature of a repeal of penalties and forfeitures, and containing no reservation, express or implied, operates as well on existing as on subsequent suits; extinguishing not only the right of pleading such defense thereafter, but of urging or maintaining the plea, although previously put in, if not already allowed and established.

The general banking law, in its provisions for the deposit, from time to time, with the comptroller, of state stocks to an unlimited amount, assumes and therefore

in legal intendment declares that the associations to be formed under it and which were to make such deposits, had authority to acquire and hold such stocks, in the same manner, and for the like purpose, as other individuals carrying on business as private bankers.

Foreign creditors, having no knowledge in fact, are not chargeable with any knowledge in law, that moneys advanced by them for a banking association in this state, although used in part in payment for public stocks, were so used in contravention of any statutory prohibition, if such there be, existing in the state of New-York; especially if the alleged prohibition be the result, not of express language, but of judicial interpretation, and would, if applied, involve a penalty, or a forfeiture of the debt.

IN EQUITY. These causes, which were an original, and a cross-suit, were commenced in the late court of chancery, before the chancellor, and were transferred to this court by the operation of the new constitution and the judiciary act. They were brought to a hearing, upon pleadings and proofs, at the general terms of this court, held in the city of New-York, in October and December, 1852. The nature and objects of the original and cross-bill, the facts established by the evidence, and the legal questions arising thereon, sufficiently appear from the following opinions, delivered by all the members of the court before whom the causes were argued.

*William Curtis Noyes, William Kent, Benjamin F. Butler* and *Charles O'Conor,* for Curtis and others, trustees, Palmer, Mackillop, Dent & Co., the Philadelphia banks and other bondholders.

*A. C. Bradley, Edward Sandford* and *Greene C. Bronson,* for David Leavitt, receiver.

*Frederick S. Tallmadge,* for the defendant Wm. G. Wood.

ROOSEVELT, J. The North American Trust and Banking Company, although possessed of several millions in bonds and mortgages, having soon after its formation become embarrassed for want of sufficient cash capital, resorted to various expedients —some, at least, of a questionable character—to obtain relief.

Curtis *v.* Leavitt.

These embarrassments, notwithstanding, became more and more aggravated, until they ended finally in the dissolution of the company, and the appointment of Mr. Leavitt as receiver to wind up its affairs. The receiver so appointed, representing the interest of both creditors and stockholders, deemed it his duty to deny the validity of a great number of the previous acts of the company, or rather, as he says, of the *officers* of the company, done in the company's name; and thus compelled, or induced, the parties claiming the benefit of those acts to file a bill to establish and give effect to their alleged rights. To this bill, Mr. Leavitt not only put in a defensive answer, but met it also by a cross-bill, on his own part, praying that the several bonds, notes, assignments and certificates of deposit complained of by him, might be declared illegal and void, and be delivered up to be canceled, and for an injunction and account. The magnitude of the amount in controversy, represented to be about two millions of dollars, and the number and difficulty of the questions involved in it, and to be extracted from six printed volumes of more than twenty-five thousand folios of pleadings and evidence, indicate, in some degree, the labor imposed both on court and counsel, and the impossibility of a literal compliance with the requisition of the code, which directs decisions to be rendered "within twenty days after the court at which the trial took place."

The primary object of the receiver's bill is to invalidate the two mortgages—for that I conceive to be the true character of those instruments—executed by the company to Blatchford and others, as trustees, and designated in the case as *The Million* and *First Half Million Trusts*. Various grounds of invalidity are urged as well against the trust mortgages as against the bonds referred to in, and which, it is presumed, have little value without them. Among the objections most relied on are alleged violations of the statute of frauds; of the statute of usury; of the statute regulating corporations; of the statute authorizing the formation of banking associations or free banks; and of the statute prohibiting the issue by the free banks of bills or notes on time or interest.

Curtis *v.* Leavitt.

The statute of frauds (2 *R. S.* 137) declares that every assign-ment given "with the intent to delay, hinder or defraud credi-tors," shall, as against the persons so delayed, hindered or defrauded, "be void." And one of the forms of this species of fraud, specifically prohibited, is that of assignments made in trust "for the use" (as the statute expresses it) "of the person making the same." (*Id. p.* 135.) In the latter case, the act itself, being on its face fraudulent, is made (for the purpose only of avoiding it) conclusive evidence in law of fraudulent intent. In all other cases the question of fraudulent intent is declared to be "a question of fact and not of law," to be submitted, of course, to the jury, if there be one ; and if none, as in the present case, to the court acting as a jury, and as a jury taking all the attend-ant circumstances into consideration. (*Smith* v. *Acker, in the court of errors,* 23 *Wend.* 653, *and Buller* v. *Van Wyck, in the supreme court,* 1 *Hill,* 438.) And further, to show the kind of fraud contemplated by the law in these latter provisions, it is enacted that every person who shall be a party to such fraudu-lent assignments or securities, *made with intent* to delay, hinder or defraud creditors or others, or shall knowingly avail himself of them as if made in good faith, "shall, upon conviction, be ad-judged guilty of a misdemeanor," punishable by fine and im-prisonment. (2 *R. S.* 135, 137, 690.)

The two chief matters in controversy in respect to this ques-tion of fraud, are the million and first half million trust mort-gages, (for that, as already observed, I consider to be the true character of the assignments,) executed by the company in the early part of the year 1840, and bearing date on the 1st Febru-ary of that year, and the bonds, fifteen hundred in number, each for £250 sterling, payable in London, executed simultaneously with, and purporting to be secured by, the mortgages respect-ively. These securities—and the fact, it seems to me, is of con-trolling importance—as alleged on one side, and conceded on the other, were created by the company, for the purpose of "raising a temporary cash capital." Instead of making 1500 separate mortgages for each separate bond—a plan which, if not entirely impracticable, would have been intolerably troublesome and ex-

Curtis *v.* Leavitt.

pensive—a resort was had to the common expedient, common especially with railroad companies, of one or two mortgages, executed to trustees, for the equal benefit of all the bondholders, who should from time to time see fit so to invest their money, according to their respective interests. And the question is, are such mortgages, in all cases, fraudulent in law and void; or were the two, in this particular case, made with an actual intent to defraud? The tens of millions of railroad bonds in which so large a portion of the funds of all classes and charitable institutions are invested, it is a matter of public notoriety, are secured precisely in this manner; and the consequences, therefore, of an adverse decision, demand for the question the gravest consideration. In 1838, the Merchants' Exchange Company, as appears by the report of the case in the court of appeals, raised $400,000, to complete their building, by the creation of 400 bonds in the name of James G. King, as obligee, secured by a deed (by way of mortgage) to the same person, of their ground and premises, in trust as security for the holders from time to time of the bonds so created; authorizing him to take possession and receive the rent of the premises, with a proviso, nevertheless, that if the company paid the bonds which had been or might be "negotiated or put in circulation," the grant was to cease and become void. The bonds not being paid, King claiming in virtue of the deed or assignment to be a mortgagee in possession, filed his bill for a foreclosure and sale; and in December, 1851, the court of appeals made a decree accordingly. (1 *Selden,* 547.) Although in the form of a trust deed, the instrument in that case was held to be a mortgage, and a valid mortgage, for the benefit of the holders of the bonds "negotiated" upon the strength of it. The same court, a year before, in the case of *Leitch* v. *Hollister,* (4 *Comst.* 211,) had affirmed the validity of an assignment of a *chose in action,* to three trustees, in *trust* to be "applied in paying the indebtedness to each of the above assignees, (they were several and not joint creditors,) in equal proportion to the amount of their respective demands against me, and the balance to me." It is manifest that the three assignees, in the case cited, were as much trustees for their separate claims, as if any other three persons had been

selected, and that the instrument if a mortgage in the one form, would have been equally so in the other. These two authorities, it seems to me, (and they are the highest and latest on the subject,) if binding, conclusively establish the proposition that the two trust deeds or assignments in question were mortgages, and that a valid transfer by way of mortgage in that form may be made to trustees, whether of real or of personal estate, and that a provision, whether expressed or implied, contained in it, and which is incident to all mortgages, directing the payment of the surplus, if any, to the mortgagor, is not a trust made for the use of the mortgagor within the meaning of the statute, and does not avoid or in any manner vitiate the transaction. It would seem to be obvious, independently of authority, that instruments, executed *bona fide* for the purpose of "*raising*" money, do not come within the principle of assignments made "in trust for the use of the person making the same," or made by an insolvent debtor to give preferences to particular existing creditors, or to secure dishonest advantages to himself.

Where, as observed by Mr. Justice Edmonds in the court of appeals, in the late case of *Nicholson* v. *Leavitt*, the hindrance and delay (of the general creditors) is the necessary consequence of an act, otherwise lawful of itself, that circumstance will not vitiate the deed; but when the *intent and object* are to hinder and delay the final payment, the deed framed with that view will be void. "The legislature," says Mr. Justice Gardiner in the same case, "have conferred upon the debtor the right to create a trust of his property for certain purposes. He may also prefer one creditor to another. Of course, the delay necessarily resulting from a fair exercise of these rights is not prohibited by any statute." "Where it becomes the principal motive," the case is different. No such motive or intent is imputed to the Palmers or to the company, except as it is to be inferred from the instruments themselves; and any such inference, it appears to me, is clearly rebutted by the obvious scope of the instruments, the circumstances of the transaction, and the whole history of the case. The fraud, if any, was not by, but upon the Palmers; and the preference, if that were a circumstance to be considered,

instead of being one of benefit, was a preference of burthen.
It should be borne in mind, besides, that these instruments,
while they created liens upon, unlike the assignments so often
and justly condemned, brought corresponding accessions to, the
assets of the company, and corresponding means for paying, in-
stead of defrauding, the creditors.   To characterize the act of
the Palmers, in seeking to avail themselves of such securities
to repay the moneys advanced directly or indirectly upon the
faith of them, as a misdemeanor, deserving of fine and imprison--
ment as well as the loss of their debt, or even as a fraud in any
degree or in any sense, shocks the commonest notions of right
and wrong.   " No one"—I use the strong language again of Mr.
Justice Gardiner—" no one would imagine, in the instance sup-
posed, that the debtor and the fortunate creditor, one, or both,
were liable in a penal action for fraud."   There being no moral
fraud then in the case, no fraud recognized or even suggested as
such by the general conscience of mankind, the Palmers are not
responsible, even if the act were prohibited by a special statute of
this state.   If citizens of another state of the union—and so the
court of appeals have just decided in the case of the *Merchants'*
*Bank* v. *Spalding*—are not chargeable with a knowledge of our
laws, of course the subjects of a distant, unconnected, trans-
átlantic government are not.

Again, it is objected, that the company had no authority to
issue bills or notes on time ; that the instruments, called bonds,
which the assignments were made to secure, being merely stamp-
ed, and not impressed on wax or wafer, were not sealed instru-
ments within the meaning of the law, but post bills or notes,
and therefore unlawful ; and that as a consequence, the assign-
ments collateral to them are, on that ground, null and void.
The statute of May, 1840, which went into operation on the 3d
of June in that year, prohibited every " banking association"
from issuing or putting in circulation, " any *bill* or *note* of said
association, unless made payable *on demand* and *without inter-
est ;*" and subjected the officer or member violating the law to
the charge of misdemeanor and to fine and imprisonment.   Ne-
gotiable securities, it is conceded, and not sealed instruments,

are the subject of the prohibition. Now, the bonds in question, in form at least, have not the slightest resemblance to bank notes of this state. They commence, like all other bonds, with the technical introduction, "Know all men by these presents," and like other bonds, end with the equally technical conclusion, "In witness whereof, the said North American Trust and Banking Company have caused this *bond* to be attested in their behalf by their president and cashier, and *their seal to be thereunto affixed*, this first day of February, in the year of our Lord one thousand eight hundred and forty." They are, besides, very long and special instruments, with fourteen coupons attached to each, and the whole contents, both capital and coupons, made payable, not in the United States, or in the currency of the United States, but in *sterling pounds*, and at the banking house of Palmers, Mackillop, Dent & Co., *London*, and they purport, not only in words, to be sealed, but bear on their face an impression stamped like a seal into the very texture of the paper, which, in this instance at least, whatever it may be ordinarily, is, as is obvious from inspection, a " tenacious substance," as susceptible of impression as either wafer or wax, or as clay, iron or silver, appended to the instrument.

We consider these bonds, therefore, as sealed instruments. At all events, it being perfectly incontrovertible that they were so intended, and that the omission, if it be one, of wax and wafer, was a mere oversight, the defect, as in the case of the indenture not indented, can now be supplied by the application by the court of a small quantity of wax, or according to the established rule in equity, by treating that as already done, which it is so manifest was intended, and if necessary, in justice and fair dealing, ought to be done. The whole discussion on this point, every sensible man must admit, were it not for some unfortunate dicta in the books, would look very much like childish trifling. Independently, however, of what we consider the conclusive answer, already given to the objection, the paper in question does not, in our judgment, come at all within the spirit or scope of the prohibition. The evil intended to be remedied by the legislature was the adulteration of the practical, if not

legal, currency of the state.  Is it to be believed that these pro-
lix, special, technical documents, for more than a thousand dol-
lars in value each, payable in seven years, in sterling pounds,
at a merchant's counting house in London, with a long tail of
interest coupons attached, transmitted immediately to England,
and intended so to be, were likely to be imposed upon, or re-
ceived by, or circulated among, the people of New-York, as
money or currency ; or, on the other hand, that the legislature
of this enlightened state, distrusting the vigilance of the British
parliament, in the spirit of a universal philanthropy, intended,
by the act of 1840, to guard the circulating medium of the
British nation from an unsafe infusion of American credits ?
I am aware that in the case of *Leavitt* v. *Palmer*, (3 *Comst.*
19,) a case of a mere unequivocal promissory note, adapted to
pass from hand to hand, it was held that, although for nearly
$5000 in value, and payable in England, and in sterling
money, the security was void, on account of its not having been
made payable on demand, and without interest.  The distinc-
tion, however, which to my mind appears so decisive, and which
the court above, I am persuaded, will, on reconsideration, re-
gard as entitled to some weight, arising from the magnitude
of the note, and the material and place of payment, although
presented by the counsel in the argument, was not, judging from
the report, at all adverted to by the court.  It seems to have
escaped attention that such instruments, when drawn in one
country, and payable in, and in the coin of, another, are in
effect bills of exchange, drawn by the makers on and accepted
by themselves, directing the transfer by their foreign agents
of so many pounds or francs, or other foreign coins, to whoever
may present the order in a foreign country ; and that associ-
ations organized under the general banking law are expressly
authorized by that law to sell foreign coins, and also to sell,
and, of course, to draw, under the name of bills of exchange,
precisely such instruments, as above described, for evidencing
the transfer.  What is the sale of a foreign bill, or of a certifi-
cate payable in foreign coin, in a foreign country, but the sale
of so much bullion in a foreign country ?  The mere paper on

which the order is written is not the subject of purchase, but the commodity mentioned in it ; the paper is worthless, it is the pounds alone that constitute value. Written out at large, the transaction would simply read, " for five thousand dollars, (or any other price agreed upon,) I sell you one thousand gold sovereigns, deliverable on a certain future day in London on presentation and surrender of this order ; and I promise faithfully that the article shall be punctually delivered according to the terms of the sale." Such a sale and engagement, the North American Trust and Banking Company, it seems to me, were clearly authorized to make and enter into, under the power " to sell foreign coins;" and, as already observed, to give the proper written evidence of the act, under the power " to sell bills of exchange." These two powers, expressly and deliberately granted in 1838, and in regard to which no complaints existed, it can hardly be said, were intended to be taken away by the vague terms of the act of 1840. Indeed, so immediate was the alarm and surprise created by the first judicial intimation in that direction, that the legislature in 1850 were called upon to pass, and did actually adopt, an explanatory amendment, declaring " bills of exchange on foreign countries," payable at the customary usance or within ninety days sight, to be excepted from the prohibition. And yet, if the interpretation suggested in the case referred to, were correct, the sale of even such bills was previously a misdemeanor. So expounded and enforced, the act might justly be designated—as it was—a legislative trap to catch the unwary. True, the act as it stood in 1840, declared as is contended, in general unqualified terms, that "no banking association or individual banker, as such, should issue or put in circulation any bill or note of said association or individual banker, unless the same shall be made payable on demand and without interest." And so the former constitution of the state declared that a two-third vote should be necessary to the creating of " *any* body politic or corporate." Yet the court of errors, looking to the intent and not the words of the instrument, in the case of *Beers* v. *Warner*, (23 *Wend.* 103,) by an almost unanimous opinion,

since confirmed by the court of appeals, held that the general banking act, although authorizing the creation by their own volition of associations having all the essential features of corporate bodies, was a valid exercise of legislative power, for the reason that such associations, not partaking of the character of monopolies or special grants of privilege, were not corporations within the spirit of the constitution; in other words, within the evil intended to be remedied. And the same doctrine was reiterated by the court of errors in the case of *Gifford* v. *Livingston*, (2 *Denio*, 380,) and by the court of appeals, as already observed, in the case of *Palmer* v. *Lawrence*, (1 *Seld.* 389.) What then, we are to inquire, was the dry letter of the act of 1840, but the evil against which it was intended to be directed? Public history tells us that it was the poisoning of the circulating medium, not of Great Britain, but of this state, by putting in circulation as *money*, or issuing for that purpose, time paper, in the form, and with all the seeming attributes of ordinary bank notes. Such paper was calculated to deceive the masses, and certain to inflate the currency. But suppose an individual banker—for the act applies as well to individual as to associated bankers—should borrow of a London merchant a thousand pounds, payable with interest in London, after twelve months, and should give him, *bona fide*, an ordinary promissory note as evidence of the loan, would, or in common sense, ought such a transaction to be unlawful? would it be a misdemeanor? would it, within the spirit and meaning of the act, be issuing or putting in circulation a prohibited medium, or prohibited substitute for money? It is unnecessary, however, at present, to carry the discussion further. The instruments, upon the validity of which we are now to pass, were neither "notes" nor "bills;" nor were they issued after the act of 1840 had gone into operation. On either ground, they are not subject to its provisions, whichever way those provisions may be construed.

Again, it is said, that banking associations, formed under the free banking act, have no power to borrow, and, of consequence, none to give bonds for the repayment of money. Suppose a sud-

den and unexpected run upon a particular institution, may it not appeal to its neighbors for temporary relief, till a portion of its assets can be converted into cash ?   Or must it, with millions of surplus securities or even bars of uncoined gold lying ready in its vaults, stop payment ?   Of what possible use would be the right of banking, by "receiving deposits" and "discounting notes," if all the deposits so received must at all times be kept untouched for fear of a possible run ?   Occasional borrowing by a banking institution, to meet an emergency, it would seem, is but the exercise, in the language of the statute, of an "incidental power necessary to carry on such business ;" and therefore expressly allowed.   Besides, the power to make a note or bill, is, in effect, a power to borrow.   And the 31st section, by providing for the form of notes of a less denomination than $1,000, when "to be put in circulation as money." necessarily implies that there might be other notes lawfully made, not so to be put in circulation ; in other words, that a free banking association, like other merchants, might give a common promissory note, provided the transaction was in good faith and not designed as a fraud upon the law.   Whether such a note on time could now be made, since the act of 1840, is a question already adverted to, but not necessary, except in respect of the claims of the Philadelphia banks, to the decision of the case at bar.   Every act of receiving a deposit, if in cash, and not to be returned specifically, is an act of borrowing ; and, if allowed by law, implies the right of incurring a borrower's obligation.   Such obligations are universally incurred by bankers, whether incorporated or unincorporated ; and they are usually evidenced by a brief entry in the lender's pass book.   That entry, written out according to its legal effect, on a separate sheet, would be a promissory note, payable to order, and with interest or without interest, as might be agreed upon. It would be a promissory note, lawfully given under the power to bank and receive deposits.   The restraining act, it may be, would qualify this implied right in virtue of the clause declaring that no person or association of persons, should issue bills or notes, "for the purpose of loaning them or putting them in circulation as money, unless thereto specially authorized by law ;"

inasmuch as the only special authority granted to the general banking associations to issue notes as money, or as the law expresses it, " circulating notes in the similitude of bank notes," is contained in the clause which allows them to " loan and circulate notes payable on demand at their place of business in this state, engraved and printed, and countersigned under the direction of the comptroller, and secured by public stocks or bonds and mortgages." Making this concession, however, to its fullest extent, still the common, and we may almost say natural, right of giving a promissory note for money borrowed, or left on deposit, remains untouched, provided the note so issued be not a " circulating note," devised in the similitude of what is generally understood as a "bank note," to be loaned or put in circulation "as money." Public policy, beyond this, required no restriction on the right of borrowing money or giving promissory notes. Individuals were competent to take care of themselves. They asked no guardianship, legislative or judicial, except against a vicious or fraudulent currency. These views, in the main, are borne out, as I conceive, by the reasoning in the court of errors, in the case of *Safford* v. *Wyckoff*, (4 Hill, 442.) In inflicting penalties and forfeitures, it should be remembered also, are not to be enlarged by implication. Hidden meanings clearly expressed, or doubtfully inferred, are not to be ascribed to them; they are to be considered as addressed to the common popular understanding. Acts not likely to strike the ordinary mind as morally wrong, if made misdemeanors by positive law, or intended so to be, should be clearly described and as clearly forbidden ; otherwise the statute becomes, as already remarked, a mere trap to catch the unwary, partaking in that respect of the worst features of tyrannical power. And in the present instance, the result of such an interpretation would be, not only to punish the morally innocent, but if there be any wrong at all in the transaction, to reward the legally guilty, to take from the unsuspecting foreign creditors the money honestly advanced by them and bestow it upon the well informed domestic stockholders, whose knowing, deliberately appointed, plenipotentiary agents, themselves stockholders also, contrived and perpetrated the wrong,

if wrong there be. A conclusion so revolting is not lightly to be adopted, nor to be adopted at all, unless, if such a case be presumable, under the clearest and most inevitable legal compulsion.

Construing the statutes, then, on this subject, in the manner above indicated, the question again recurs, were the bonds issued to the Palmers, using that name as designating all the foreign creditors, unlawful bills or notes, fraudulently intended for circulation in this state as money? We think it quite palpable they were not. *First.* They were not bills or notes, but sealed bonds. *Second.* If bills or notes, they were in the nature of bills of exchange which the company might lawfully sell. *Third.* At all events they were not adapted or designed for circulation as money, either in this state or in Great Britain. *Fourth.* The legislature of this state did not intend to enact or regulate a policy for foreign countries.

As to a large number of the bonds, it is further insisted, that having been sold at 90 per cent instead of par, they are void for usury; and that the associate stockholders, while holding on to the proceeds of the sale, have a right to repudiate its obligation. The receiver, Mr. Leavitt, took the same ground in the case of DeLauny & Co.; the particulars of which I shall presently advert to, and after several years of various fortune was finally defeated in the court of last resort. (4 *Comstock,* 363.) There is no pretence, or if there be, it is wholly unsupported, that these bonds, by whatever name they may be called, were got up or employed as a *cover* for usury; if usurious at all, the transaction is so *per se* on its own naked merits. Divested then of the mere formalities of written instruments, what, in substance, so far as this point is concerned, was the actual transaction between the parties? A pound sterling is a foreign gold coin, commonly denominated a sovereign. The banking company in question were invested with the express power of "buying and selling foreign coins and bills of exchange." They sold accordingly from time to time, a certain number of English sovereigns, deliverable at periods agreed to by the purchasers, and in London where the purchasers lived. As usual in such cases, they sold

the article on more favorable terms for cash than if on credit. The article being deliverable also at a remote future day, and not immediately, was another reason for a less price. The bond was but the written evidence of the bargain ; it was the bill of sale, sealed and delivered, as the Palmers say, but none the less a bill of sale ; it acknowledged the right of the obligee to the number of sovereigns sold, and admitted the promise, and contained the order of the obligors to deliver them at the time and place specified. What is there usurious *per se* in such a transaction, whether we take the laws of New-York or the laws of England, as the rule for our decision ? That such a sale might be made a cover for usury, all must admit ; but so may any sale of merchandise. We are to look, not to what it might be, but to what it was. Where a transaction otherwise lawful is impeached as a cover for usury, the averment must be distinctly and specifically made in pleading, and as held by the court in the DeLauny case, fully established in proof ; here there is no pretense of disguise, and certainly no proof of any. In the case of the *DeLaunys*, (4 *Comstock*, 363,) which is the latest authority on this subject, there were in effect two sales of foreign coins, one made by the DeLaunys to the company, deliverable in Paris, in 60 days, and the other for the same amount made by the company to DeLauny, deliverable in 55 days thereafter. The company thus in effect had the use of Messrs. DeLaunys' 250,000 francs for 55 days, and the latter by the agreement were to receive not only seven per cent interest, but a commission. This commission, the receiver contended, made the transaction usurious, and he sought then on that ground, as he does now, in the case of the Palmers, to have the collaterals delivered up, and the obligation declared void. The company received the avails of the DeLaunys' bills of exchange, but the receiver repudiated the company's obligation to pay for them ; in this, the court of appeals very justly, as I conceive, refused to sustain him, and affirming the previous judgment of the supreme court, dismissed his bill. On the point of usury I see no distinction in principle between the two cases ; in the one the company virtually sold their bills for credit, in the other for cash ; in both

actually or virtually, for less than their face; and in both too, the effect was, and was almost inevitably calculated to be, the same as that of borrowing money at a higher rate than 7 per cent. In both cases there was alike a chance of gain; much more favorable however to the company in the English than in the French sale. Pounds sterling or gold sovereigns might be much less valuable in 1847 than in 1840, whereas French francs were not very likely to change for either better or worse in two months. In the matter of commissions and interest, taking the different rates and periods into consideration, of the two bargains, the English, it will be seen, was far the most favorable to the company. The DeLaunys, however, unlike the Palmers, instead of cash, gave the company in payment sixty day bills, which the company could, and no doubt did, sell for cash, at a discount. If this circumstance creates any difference between the two cases, it is obviously in favor of the Palmers, so that on the point of usury the decision of the court of appeals, in the case of Leavitt and DeLauny as an authority must be considered conclusive. When, say the court, the transaction is a sale or exchange of credits, and there has been no application or treaty for a loan, "the vendor may reserve more than seven per cent." A sale of francs, or gold sovereigns, deliverable in a foreign country, whether immediately, or at sixty days, or six years, is thus placed upon the same footing as a sale of iron or copper, or other metal not fashioned with the image or superscription of any prince or potentate. Again, it is said, the assignments or mortgages made to secure these sterling bonds are void, as in violation of the 8th and 9th sections of the statutory "regulations, to prevent the insolvency of moneyed corporations, and to secure the rights of their creditors and stockholders." (1 R. S. 590.) Admitting, for the present, that the regulations adopted in 1830, to govern the conduct of monopoly corporations, as then understood, are by construction to be applied to limited partnerships, like the free banks, deriving their existence from the mere volition of individuals under a general law passed in 1838, and which, instead of creating any legal entity which might by possibility be adjudged a "body politic or

corporate," was studiously framed to avoid or evade such a result; admitting, I say, for the present, this seemingly extraordinary proposition, let us see whether, on that assumption, there has been any such violation of law as is alleged. Section 9 of the regulations referred to, provides, among other things, that no securities given by any such corporation, when insolvent, or in contemplation of insolvency, with the intent of securing a preference to any particular creditor over other creditors of the company, shall be valid in law.

Now the trust mortgages, under which the Palmers claim, instead of being executed with the intent of giving them a preference, were designed emphatically and palpably, (and that alone would dispose of the argument,) for the purpose of extracting from their unfortunate confidence further advances and larger indulgence; and instead of being made by the institution when insolvent, or in contemplation of insolvency, were as palpably and emphatically devised under the full conviction, that by turning dead securities into living cash, they were to operate as a panacea to infuse life and vigor into the feverish institution and insure it immortality. Nor was the institution supposed to be, nor, under the evidence, was it, in fact, insolvent. Embarrassment may exist without insolvency. The owner of a million, in real estate, may, at times, it has been said, be embarrassed for a meal. To say, however, that a lawyer, for instance, with a perfectly good professional business, and with surplus earnings, well invested, to the amount of $100,000, is insolvent because from inadvertence or carelessness, he may not have in ready cash at the moment, enough to pay a fifty-dollar tailor's bill, would seem an absurd perversion of language. In the framing of technical bankrupt laws, it is, perhaps, found necessary, or, at all events, is sometimes deemed politic, to declare that want of punctuality shall be deemed want of honesty. Hence, under such a law, men have been declared bankrupt, with means sufficient to pay forty shillings in the pound. The statute in question, however, is not a bankrupt law. It uses the term insolvency, without any special definition; and, therefore, in its ordinary acceptation, that is, as meaning a want of sufficient property,

Curtis *v.* Leavitt.

whether cash or other valuables, to pay, if disposed of in the ordinary way, without unnatural or protracted nursing, certainly and absolutely, all demands upon it. To say that a banker rais- ing money on mortgage is, for that reason, to be deemed insol- vent, and that being thus insolvent he is to be deemed incapable of mortgaging, is an absurdity. He mortgages to enable him to be punctual; it is the appropriate method of attaining the end; how, then, can the appropriate means be made void, while the end is enjoined? To prevent misapprehension it should be ob- served, that insolvency, whether existing or contemplated, is not, of itself, sufficient by the law to avoid the security; there must be superadded the intent to give a preference. Both conditions must concur; and the absence of either, according to the terms of the law, defeats the objection and leaves the security in full force.

It is said again, that, being transfers of assets of the com- pany to the value of more than $1000 each, the assignments were also a violation of the 8th section of the regulations re- ferred to, which prohibits such transfers, unless "authorized by a previous resolution of its board of directors." On this point, as matter of fact, we think there is sufficient evidence of authorization or ratification; but at all events, the instru- ments on their face being signed by the proper officers, and pur- porting to be regular, cannot be impeached "in the hands of a purchaser for a valuable consideration and without notice." Such is the express exception in the section, and such, as we conceive, is the precise position of these securities. On this point, too, and on another of the same character made by the receiver, it may be proper to observe that the objection comes with a bad grace from stockholders (or any one in their behalf) who had deliberately and irrevocably in their public articles of association "delegated" not only to the directors, but to such *officers* and agents as the directors should appoint, "all the power, rights and privileges of each and *all* the associates."

No directors, moreover, and no boards of any kind are re- quired by the general banking law, either expressly or by im- plication. The terms are no where used in any of its provisions;

they are studiously avoided. The only agents named are a president or vice president and a cashier; and they are the only agents by whom "contracts made by any such association, and all notes and bills by them issued and put in circulation as money, shall be signed." (§ 21.) How, then, can penal regulations, made in reference to "*boards* of directors" of chartered corporations, be applied, by construction, to these unchartered partnerships, in whose organization such boards were neither required nor contemplated, nor even mentioned or alluded to? To associations which were not only exempt from any obligation to elect boards of directors, but after choosing (without any such intervention) a president and cashier, the only officers made necessary by the law, were authorized, *ad libitum*, like other partnerships, "to appoint such other officers and agents as their business may require, and to remove such president, cashier, officers and agents at pleasure, and appoint others in their stead." (§ 18.) Associations which, in the words of the law, might be formed of any number of persons, even as few as *two*, who should see fit to "establish an office of discount, deposit and circulation, upon the terms and conditions, and subject to the liabilities prescribed (not in the restraining acts or other statutes, but) in *this* act." Was the election of a "board of directors," or any other board, one of those term and conditions? The whole frame and scope and history of the act, conclusively show that it was not. Its creations, or rather the creations authorized under it, were to be free banks; banks neither fostered by special privileges nor fettered by special restrictions; but, like ordinary commercial partnerships, left, with the exception of the currency, to regulate their own affairs in their own way, giving to their managers and officers and agents whatever powers, and imposing upon them whatever limitations, they saw fit.

Much of the litigation which has grown, and still threatens to grow out of these associations, may be traced to what I conceive to be a false issue. The question is not, do these partnerships, by their members more or less numerous, possess the essential powers of a corporation; but are they corporations within the intent and meaning of the restriction in

the former constitution of this state, in regard to corporations? and, if not—and so the court of last resort has three times decided—did the legislature bringing them into being under the constitution, and under the belief that they were not corporations, and with the full purpose that, whatever might be their nature, they should not be deemed corporations, intend nevertheless, or rather, is the legislature to be judicially forced to have intended, that all previous legislation in regard to express corporations should, by implication, be applied to these new existences? That they are not corporations within the meaning of the constitution, and therefore not guaranteed by it, was long since, as already shown, fully and finally established by the court of last resort. And its seems to me to follow, as a necessary consequence, that they are not to be deemed to have been, as they certainly were not, corporations within the meaning of acts of the legislature, whose constitutional validity depended upon the assumption that they were not. For it will hardly be contended, I presume, that it is competent to the judiciary to force upon the legislature any more than upon the convention, a meaning they notoriously did not entertain, and which, in no way necessarily or fairly results from their language, and is at variance with the whole policy and scope of their enactments, contemporaneous and subsequent. It may not be within the power of the legislature, by its mere will, to make that not a corporation which, in fact, is a corporation; but it certainly is within the power of the legislature to ordain, and to ordain effectually, that partnerships may be formed of a particular kind, with certain privileges and exemptions; and that although possessed of certain corporate attributes, they shall not be defined or deemed to be corporations; and that regulations made in respect of corporations *eo nomine* shall not apply to them. Now, if the legislature, in regard to the general banking companies, have not expressly said all this, they have, as clearly appears from numerous provisions cited by counsel, said what is tantamount to it. Under the old system, prior to 1838, banks were uniformly denominated in the statutes, " moneyed *corporations*," or " *corporations* having banking powers ;" and the rules

Curtis v. Leavitt.

for their government were entitled "Regulations of moneyed *corporations*" and "Special provisions relating to certain corporations;" whereas the act of 1838, instead of authorizing the forming of *corporations*, is entitled "An act to authorize the *business* of banking," and provides for a conditional repeal of existing restraining enactments, and for the formation of *associations*, not by the privileged few, but by *any* persons " declaring;" not that any persons may incorporate themselves, but that any persons may " *associate* to establish offices of discount, deposit and circulation," and that when suits are brought or conveyances made by, to or against such associations, instead of employing an artificial name, as in the case of corporations, it shall be lawful and necessary to use the individual " name of the president," and that if any " such *association* shall violate any of the provisions of this act, it may be proceeded against and dissolved by the court of chancery, *in the same manner* as any, not as any other, moneyed *corporation* may be proceeded against and dissolved ;" and, as it were, to crown the long list of almost hypercritical exclusions of the much dreaded conclusion, that the members of the newly authorized firms, instead of " stockholders," a term which had contracted a sort of corporation odor, should be denominated " shareholders," and "associates" therein. Indeed, any person who will take the limited partnership act of 1822, and compare it with the general banking law of 1838, will perceive, in a moment, that the former served, to a great extent, as the model of the latter. By the former, partnerships were allowed to be organized, in which all but one member might be exempted from personal liability; by the latter, all might be exempted; by the former, a certificate containing all the particulars in which the public had an interest, was to be made and filed in a public office; by the latter the same; by the former, suits might be brought by or against the general partner, in the same manner as if there were no special partners; by the latter, in the same manner, by or against the president of the association; by the former, contracts were to be signed by the general partners for the *firm ;* by the latter, by the president and cashier for the association. Wherein, then, so

Curtis v: Leavitt.

far as respects the question of corporation or no corporation, do these two classes of partnerships differ in principle? If there be any such difference, it can only be found in the provision which declares that "such associations (those under the general banking law) shall not be dissolved by the death or insanity of the shareholders therein." But suppose such a provision to be enacted embracing all partnerships, would all partnerships thereby become corporations, and be subjected, *nolens volens*, so far as the legislature are concerned, to all the statutory provisions relating to corporations? Further, to show the sense of the legislature, look at their enactments subsequent to the law of 1838. In May, 1839, they declared that, after the passage of the act of that date, it should not be lawful for "any incorporated banking institution within this state, *and for any association*," &c.; to receive or pay out certain foreign bills, repeating, in the act, the same form of expression no less than ten times. In May, 1840, they declared that every moneyed incorporation in the state, having banking powers, &c., and *every banking association*, &c., should appoint a redemption agent; repeating the same form of expression ten times again. And again, in the same month, admitting, by the most conclusive implication, that previous enactments in regard to corporations, as such, did not extend to these associations, they provided, as had already been done as to corporations, that "associations" should not circulate notes on time, and should be subject to the supervision of the bank commissioners, not like *others*, but like "incorporated banks." In March, 1841, asserting again by the most decisive implication, that the general law of corporations did not apply to these associations, they removed a difficulty attending banking like other partnerships, by authorizing suits by or against the individual associates, against or by the association. And a few days after, in another act, repeating the expressions no less than four times, they speak of "associations" as distinct from, and not comprehended in "corporations," and as requiring an express specification to include them. In April, 1843, the incorporated institutions are distinguished as "chartered banks;" and not deeming the term bank sufficiently explicit to include

Curtis *v.* Leavitt.

all, it is provided that "every bank *and banking association,* shall make a quarterly report." And if any bank or banking association shall neglect or refuse "it shall forfeit its charter, *if an incorported bank,* and its privileges as a *banking company, if organized under the law of April,* 1838." Not till April, 1847, was there any act speaking of directors of the unchartered banks. In that year, for the first, the legislature enacted that every banking association, formed under the general law, should be subject to the provisions of the revised statutes containing the "regulations concerning the election of directors of moneyed corporations." And in 1849, it was provided that the stockholders of "*incorporated banks,*" whose charters were about expiring, might organize as *associations* under the general law; treating the two classes as distinct, and the latter as not incorporated. Other acts still later might be referred to, of a similar character, and leading to the same inference; but it is unnecessary to swell the list. That inference is, as before stated, that the legislature in authorizing the formation of a certain class of limited partnerships, exempt from dissolution by death or insanity, never supposed they were creating corporations, or creating a class of legal entities, to which mere positive corporate prohibitions, without any expression of such intention, necessarily applied. I am aware that there are some seeming, and perhaps real, contradictions in the authorities on this, as well as other points involved in the present discussion. To state and comment on the facts and reasonings of these cases at length, would involve, in my judgment, a very unnecessary and unprofitable prolixity. One remark may be made in reference to the whole; they illustrate how a forced, and of consequence a false, construction of a statute, as of any other writing, may, as it inevitably must, lead in the progress of events, to all sorts of embarrassment. The only thing that harmonizes with itself, and with all other truth, is truth. When the late court of errors, by a unanimous vote, declared that the convention in framing, and the people in adopting the constitutional restriction of 1821, in regard to the creation of corporate bodies, referred solely to specially privileged monopolies, deriving their existence

from legislative favoritism and direct legislative action, and not to commercial partnerships, endowed, it may be, with certain corporate attributes, but authorized by *general* laws, and open to all men alike; when that court, I say, so declared, they did but announce a known public fact; and when, further, they held that knowing the intention of the law making power (in that case the sovereign people themselves) it was their duty to execute it, they did but apply a sound and well established rule of government. Had the principle of this decision been subsequently observed, leaving legislative omissions, if any, to be supplied by legislative, instead of judicial enactments, much litigation and confusion would have been avoided, and the judicial history of the state would have been preserved from the opprobrium, seemingly not altogether unmerited, of inflicting *ex post facto* penalties, for acts, which, at the time they were done, had, to the common understanding, and to the common conscience, all the appearance of legality, and which were sanctioned, we may add, by the soundest and ablest legal advisers in the state, fortified subsequently, if not contemporaneously, by direct adjudications of the highest courts in the state. The first adjudication, (that in *Beers* v. *Warner*,) it should be remembered, was announced and published on the 7th of April, 1840. In the "summary" furnished to the court by the receiver's counsel, it is stated that the million trust was "created" on the 20th of April, 1840, and the first half million trust on the 28th; the second not till July, 1840. The parties, therefore, in the creation of these securities, had before them, and we may fairly presume relied on, the decision of the 7th April, then just published. It was a decision, moreover, to which this very company was a party; and a decision, the principle of which was again directly re-affirmed by the same court in *Gifford* v. *Livingston*, in December, 1845, (2 *Denio*, 380,) and by the present court of appeals, in the recent case of *Palmer* v. *Lawrence*, (1 *Selden*, 389.) How, then, does the argument stand? In 1821, the convention, or rather the sovereign people, legislating directly instead of by representatives, declare that a two-

Curtis *v.* Leavitt.

third vote in each branch of the legislature shall be requisite in each particular case, to every bill creating *any body politic or corporate.*" In 1838, seven years after, the then legislature, sworn to support this constitution, pass an act, without a two-third vote, authorizing the formation of a class of partnerships differing in no essential respect from other limited partnerships, except in not being dissolved by death or insanity; and they declare, by necessary implication from the whole structure of the law, and from its mode of enactment, that the associations so to be formed are not, as they the legislature view them, and shall not be deemed or taken to be, corporations. Two years after this, the highest court in the state, on full argument upon the precise issue, declare, and their decision is published abroad, that the legislature, in this view taken by them of the matter, were right, and that the law was valid; in other words, that these "associations," whatever their nature might be, were not corporations, as that term had been previously used, and was generally understood. On the faith of these solemn legislative declarations and judicial expositions, the public at large deal with these special limited partnerships as associations unincorporated, as that term was then understood; and not subject, therefore, to certain penalties and forfeitures which had been prescribed by previous legislatures (whose acts, be it remembered, their successors had a perfect right, prospectively, to expound, modify or repeal) for the government of corporations, as such, and by that name. And now, after immense sums of money have been obtained by these associations, especially from unsuspecting strangers, on the faith of these repeated, solemn, deliberate and duly authorized announcements, shall the plea be tolerated, whether made by the associations themselves, or by receivers in their name, that the transactions thus impliedly sanctioned were unlawful, (as being prohibited to corporations,) and as a consequence, that the money advanced upon the faith so reposed has become forfeited? And forfeited, too, not to the injured or presumed to be injured public, but to the authors and promoters of the guilt, if guilt there be? Justice has no attribute

that can side with such a defense, and public honor indignantly repudiates it.

Much severity of criticism, and perhaps very justly, has been bestowed upon the officers and agents of the association in question. But did not the shareholders appoint them? Did not the shareholders place all power in their hands? Did not the shareholders so declare expressly, and we may add very unnecessarily, in their published articles of copartnership? As between the agents and their injured principals, if the latter really were injured, (*volenti non fit injuria*,) these criticisms might perhaps be allowable; but what application have they to a case of injury done by those agents to third parties, through the very faith and confidence which their principals had so prodigally solicited? Is denunciation, however well deserved, of the agents, to be deemed a satisfaction of the debt of their principals? If the agents have been guilty of improvident, or even, if you please, of fraudulent acts, who should take the consequences; they who held them forth as vested with "all power, rights and privileges," or they who trusted them on the faith of such credentials? Did not the shareholders, moreover, know—indeed, was not that the leading object of forming the association—that their dead securities, in the form of mortgages or unavailable real estate estimated at more than forty per cent beyond its convertible value, (see the receiver's summary,) were, somehow or other, to be transmuted into the precious metals? And did they not select the agents, whose proceedings they now denounce, with an express view to their known, or at least reputed, abilities in that branch of art? How else was their cash capital, if any, to be raised? The association, in its inception, as appears by its articles of copartnership, consisted of twenty members, with one thousand shares each, of one hundred dollars, making an aggregate of two millions of nominal capital, and which it was provided "might be paid in any of the securities in which the directors were authorized to invest their capital stock;" in other words, in bonds and mortgages. Borrowing and not lending, therefore, at least in the outset, was palpably the object of the associates; and as that object, at the time,

could not very readily be effected to the extent desired, on this side of the Atlantic, it became necessary to convert the bonds and mortgages, unavailable in their primitive formation, into a sort of bank stock, to be used as machinery for extracting gold from the mines of London. Such, I say, was palpably the design of the associates, and what right have they to complain if their agents, men of their own selection, and members, too, of their own body, carried it out? And was not the general banking law itself, whatever may be in other respects its merits, framed in this same spirit? It originated, notoriously, with the holders of inflated real estate, whose ambitious aspirations could not endure the collapse of 1837. Its first provisions, therefore, from section one to fourteen, were directed to the repletion of the exhausted currency, by authorizing the comptroller, out of the mixed metal of state stocks and individual mortgages, to coin "a quantity of circulating notes in the similitude of bank notes," to be delivered to such persons as should have furnished him with the raw material. The leading object of the remaining sections was to declare that if banking partnerships would deposit copies of their articles of copartnership, in certain designated public places, they might (notwithstanding the restraining act) establish offices of discount, deposit and circulation, make the interests and liabilities of the partners transferable, exempt them from individual responsibility, and continue their associated existence, notwithstanding the death or insanity of particular members. No provision, it will be seen, was made for any capital to be paid in, or for any individual liability; and if business men saw fit to trust such associations they were at liberty to do so; they would do it with their eyes open and with full notice. Guarding, as was supposed the currency, which was deemed a public concern, the legislature left all the rest to individual control. And as the associations, although authorized, were not obliged to issue circulating notes, if they waived that privilege, they needed only subscriptions in form, but no capital in fact; an omission so extraordinary, although no doubt intentional, that the legislature, in 1840, were compelled to declare that no association thereafter should commence business until

they had at least $100,000 in securities, such as the comptroller was allowed to receive. To say, then, that the association in question was not authorized to borrow, on a pledge of securities, is to deny the vital principle of its existence, the very object for which it was created and for which its creation was authorized. If the officers, therefore, borrowed money, if they bought stocks on credit and sold them for cash to raise money, if they solicited deposits and tempted their continuance by the promise of interest to the depositor, they did that which their associates and constituents wished and expected them to do, and which the latter have no right (with the proceeds in their pockets) to repudiate now that it is done. It should not be overlooked, in this connection, that not only did the general banking law expressly and in broad, unrestricted terms, authorize these associations to "receive deposits," but in the present instance, the associates, not willing to leave the right to receive deposits on time to necessary implication, expressly provide in their articles for "receiving deposits *on interest* or otherwise." And what is a loan of money but a general deposit, on interest or otherwise, as the parties agree? And if on interest, of course on time, shorter or longer, certain or uncertain, according to agreement; for interest is a compensation for the use of money, and without time there can be no use. Besides, to receive deposits on time is now and ever has been, an acknowledged part of the business of banking, and may, on occasion, as an incidental power, be necessary to carry on that business; especially in the case of associations, whose whole capital as the law stood, might, if they chose to issue no currency "in the similitude of bank notes," consist of bonds and mortgages on real estate. Indeed the power of receiving deposits at a low rate and reloaning them at a comparatively high rate of interest, would seem to be not only the legitimate, but the most natural source of profit to such an institution, and also indispensable at times to guard its credit against a sudden run. The power, like any other, may be abused; but that is no reason for either destroying or denying its existence. And, even admitting its abuse, what interest have the public that they should interfere

Curtis *v.* Leavitt.

by penalties and forfeitures, to be put into the pockets of the conniving, if not consenting, shareholders? and to be extorted from innocent, unsuspecting strangers, by the forced, *ex post facto* imposition of positive arbitrary enactments, which the legislature itself studiously avoided applying to such cases, and which, from their penal nature, are by a fundamental rule of legal interpretation, as well as by the commonest dictates of natural justice, precluded from being extended by inference? (*Sprague* v. *Birdsall*, 2 *Cowen*, 419. *Jones* v. *Estis*, 2 *John.* 379. *Dash* v. *Van Kleeck*, 7 *Id.* 477. *Johnson* v. *Burrell*, 2 *Hill*, 238. *Myers* v. *Foster*, 6 *Cowen*, 567.)

But, although not necessary to the argument, it may also be contended, and very justly, that to grant the power of carrying on the business of banking upon a mere mortgage capital, carries with it, by necessary implication, without reference to the power of receiving doposits, the right of borrowing money. How else, with such a capital, were they to discount notes, or buy bills of exchange, or foreign coin or bullion, all expressly allowed to them, and confessedly within the range of a banker's business? They might, it is true, make such purchases on credit; but what, for the purposes of this question, is a purchase on credit, but, in effect, a borrowing of the amount of the price agreed on for the period stipulated in the credit? That they can buy on credit was decided by the court of appeals in the recent case of De Launy, already referred to; which was the purchase of a sixty day bill, to be paid for in two or (more properly speaking) in four months; or, in other words, the company borrowed of DeLauny a certain number of francs deliverable in two months, on a promise to return a like amount, with interest and commission added, in two months thereafter. This contract was adjudged to be valid, and also the written instruments, on both sides, which evidenced the obligation.

We have seen, then, that the association, both in express terms, and by necessary implication, authorized its officers, whenever they should deem it necessary, to raise money, either on a simple promise to repay, or on a pledge of securities. We have also seen that the general banking law, in like manner, gave the

association the right to delegate such a power to its officers. And further, we have seen that evidences of such indebtedness might be given either by entries in pass-books, or by bills of exchange drawn on a foreign agency, or by bonds with or without coupons attached, or in any other form, except such as should bear " the similitude of bank notes," or be artfully contrived to defeat or evade that prohibition. After June 3d, 1840, when the act of May previous went into operation, it may be that the association could not give a "*note or bill*" unless made "payable on demand and without interest." (§ 4. *Leavitt* v. *Palmer*, 3 *Comst.* 19.) But were it necessary to the argument, and were it an open question, as we think it ought to be, we should say that that act applied only to "circulating notes." Its language is, that " no banking association shall *issue or put in circulation* any bill or note," &c. It was but an extension to these partnership associations, of one of the prohibitions then existing against monopoly *corporations.* (10 *Paige*, 109.) For by the act of April 2d, 1829, commonly called the safety fund act, then in force, it was provided that " no moneyed corporation, subject to the provisions of that act, should issue any bill or note of the said corporation, unless the same should be made payable on demand and without interest." (And here, in passing, it may be proper to observe a decisive evidence that the legislature did not consider these newly authorized associations as coming within the description of moneyed *corporations ;* else why such an enactment ?) What then was the meaning of the terms " issue or put in circulation" as applied to the business of banking, whether carried on by corporations or by free banking associations ? In other words, what was the *thing* intended to be prohibited ? For, as very justly expressed in one of the receiver's printed points, "statutes prohibit things, not names."

Chancellor Walworth, in the case of the *Ontario Bank* v. *Schermerhorn*, (10 *Paige*, 109,) gives the answer to this question. The provision was intended, he says, "to prevent the banks from issuing post notes, or post bills of exchange, *which might pass from hand to hand as part of the circulating medium of the country.*" As the paper, in that case, was a draft

Curtis *v.* Leavitt.

drawn by the bank in Canandaigua on a bank in Albany, not to order or bearer, he held that it was valid, although not payable on demand, but thirty days after date. "Notes and drafts not negotiable, said the chancellor, and which for that reason, cannot be used or circulated as a substitute for money, when issued by banks in the course of their business, either as evidences of indebtedness to particular individuals or for other legitimate purposes, are clearly not within the mischiefs which the legislature intended to guard against by those prohibitory provisions, although the language used by the legislature is broad enough to cover that kind of securities also, where they assume the character of promissory notes or bills of exchange." This case, like that of *Beers* v. *Warner*, is a direct authority also for the proposition that words, however general, and whether used in a statute or in a constitution, are to be restrained to the particular subject under consideration; that, as the legislature in the enactment in question were directing their attention to paper which was to be "issued or put in circulation," they were to be deemed, when using the term "any bill or notes," to have intended any circulating bill or note adapted and likely to be used as a substitute for money; and that a draft not payable by its terms to order or bearer, although expressed in dollars and not in foreign coins, and drawn on a domestic and not a foreign place, was, therefore, not within the prohibition, and if issued in good faith, was valid. The result is that the terms "issue or put in circulation," when used in reference to banking in this state, have a restricted, special and almost technical meaning relating exclusively to the moneyed currency of the country, or, in the language of the general banking law, to "circulating notes in the similitude of bank notes." No banking association, it was provided, should put out *such* notes, directly or indirectly, unless they were made conformable to the legal standard; that is, first, unless the holder was made safe by a previous deposit of the required security; and second, unless the whole community were protected from moneyed inflations, by a strict liability on the one hand to pay in coin on demand, and on the other to lose all interest if not promptly demanded. It was *such* notes and such only, and *such*

issuing and putting in circulation, that the legislature had in view, when they created this new misdemeanor.   All this, it is said, may be very good reasoning, and the decision of Chancellor Walworth, when pronounced, might have been very good authority, but the court of appeals, a higher tribunal, now holds, or at least have held, a different doctrine.   In the case of *Palmer* v. *Leavitt*, the notes then in litigation, we admit, were adjudged to be illegal and void, as issued after and in contravention of the act of 1840.   They were negotiable, could pass from hand to hand, and were in all respects in the ordinary form, (unless in three particulars to which I shall presently advert,) and being made payable expressly on time and with interest, they were, unless those three particulars make a distinction, palpable violations of the law.   Those three particulars, however, as already observed, although to some minds, and I confess to my own, they may appear important and even controlling, were not adverted to by the learned judge, who delivered the opinion of the court. They were, the magnitude of the amount, the place of payment, and the kind of payment.   And these particulars, when considered, cannot fail to suggest the question to every practical mind, could promissory notes on time, made payable in *pounds sterling*, in *London*, and in sums exceeding in value five thousand dollars each, and intended to be negotiated, not here, but in London, have an influence on, or be likely to become part of, the currency of the state of New-York ?   And if not, why should the legislature of the state of New-York have prohibited, or be deemed to have prohibited the use of such paper ?   Or rather, is the prohibition so clear and the reason for it so palpable, that the act should, or by any just rule of interpretation can, be pronounced a misdemeanor punishable by fine and imprisonment ? For it should be kept in mind throughout all the stages of the argument that the contracts in question cannot be void unless they are at the same time criminal misdemeanors.   If void, they are so because prohibited by statute ; and where the performance of any act is prohibited by statute, the doing such act, (unless otherwise specially declared,) " shall be deemed a misdemeanor." (2 *R. S.* 696, §§ 39, 40.)   And in this particular case the very

Curtis *v.* Leavitt.

section containing the supposed prohibition, makes every violation of its provisions, as already observed, an act punishable by fine and imprisonment.

Does any man then suppose, however much he may denounce, and perhaps justly, the general conduct of the officers and managers of the North American Trust and Banking Company, that were they brought to trial criminally on a charge of issuing a promissory note in London for £1000 sterling, payable, with interest, in sixty days, any jury could be found to convict them of a misdemeanor, or any judge to sentence them to fine and imprisonment? Even the learned justice of the court of appeals, who delivered the opinion of that court on the occasion referred to, and who is now one of the learned counsel of the receiver, would hardly go that length. And yet, unless the act was a misdemeanor, and a misdemeanor of a criminal character, it was not void; for it is the prohibition by statute which alone makes it void; and it is the same prohibition which makes it a misdemeanor. It may be that, to test this question, a criminal prosecution is now pending, and that the accused, waiving the statute of limitations, puts himself upon what he is advised and believes to be the fair and just interpretation of the language and of the intent and meaning of the legislature; if so, what judge will be found to charge the jury that making a bill for £1000, payable in England at sixty days sight, and sending it *bona fide* to London to be sold for cash, is prohibited by the section already so often cited; that the mere note itself, in spite of all evidence to the contrary, is conclusive proof of an intention to issue and put in circulation a spurious currency, within the meaning of the law; and that the accused must of consequence be found guilty of a misdemeanor, and be punished accordingly.

Admitting, however, such a result, improbable as it may be, we are driven then to the mere letter of the law, and to assume, contrary to the general rule, that the legislature intended to prohibit *words*, not things. On that assumption, the prohibition must be confined, for they are the only *words* used, to bills and notes. Literally and strictly, and in some respects (such as the right of offset) even substantially, a bond is not a bill or

note. If then, as already shown, the bonds in question, were really and truly bonds, and not notes, the conclusion, in that view, would be that, even if issued after June 3d, 1840, they were not prohibited, and are valid securities. Hence, in the case of the Merchants' Exchange Company, an admitted corporation, where the notes issued were precisely the same as the present, neither court nor counsel suggested a doubt of their validity, notwithstanding that the company, by the 3d title of the law in relation to corporations, (1 *R. S.* 599,) were expressly prohibited " from issuing bills or notes or other evidences of debt upon loan or for circulation as money." And the court accordingly decreed the mortgage given to secure such bonds a valid instrument, and ordered a foreclosure and sale. And this, too, was done after the discussion and decision in the case of *Leavitt* v. *Palmer.* But the case of *Leavitt* v. *Palmer,* even when the instruments are literally bills or notes, does not appear to have been followed in the subsequent case already cited from the same court. ˀ The instruments stipulated by the association to be given to the DeLaunys were *bills,* and were bills at 60 days, and of course *not on demand ;* and yet the stipulation was held valid, and the stock transfers, made to secure it, enforced as legal acts. And how could a *stipulation* to give bills be valid, if the *bills,* when given, would have been illegal, and the act of giving them a misdemeanor? And if a bill on time, payable in French coin and in a French city, was valid, how, under a statute speaking indiscriminately of " both bills and notes," could a note payable in English coin and in an English city be void ; or how, stating the case criminally, could the latter act be palpably a misdemeanor, while the former, under the same law, was innocent and legal? In the one case, the promise held to be void, was to pay, not on demand, but at a future time, one thousand sovereigns in London ; in the other case, the promise, held to be valid, was to pay, not on demand, but at a future time, two hundred and fifty thousand francs in Paris. If these two decisions be not contradictory, it would be difficult to conceive what is a contradiction. And if they are,

then the rule (of the law as well as of the gospel) clearly applies that the last shall be first, and the first last.

One thing cannot fail to strike every thinking mind with astonishment in looking at this cause, and that is, that a charge of criminal misdemeanor should be extracted from a law thus differently interpreted by the ablest courts and the ablest counsel, and that, too, under a system of jurisprudence which inculcates, as fundamental, the principle that pains and penalties are to be clearly prescribed in advance, and not to be extended by *ex post facto* implications. It may be urged, perhaps, that in the case of DeLauny, and in the case of the Merchants' Exchange Company, the time feature was not adverted to by bar or bench. And can it be contended that in two strongly contested cases, involving, one of them fifty thousand dollars and upwards, and the other more than one million; a circumstance, fully in the view of both bar and bench, should be treated by both as innocent and legal, and yet be a misdemeanor subject to fine and imprisonment? Where court and counsel are blind, a confiding community, especially of strangers, may be pardoned for not seeing. Indeed in the case of the *Merchants' Bank* v. *Spalding*, decided only a few days since, the court of appeals expressly held "that citizens of another state, making contracts in that state to be performed there, are not chargeable with a knowledge of our laws." That was a case of a circulation of foreign bank bills of a less denomination than five dollars, which the statute prohibits; and yet the charge of the judge, that the plaintiffs, in the absence of proof of any actual knowledge of the prohibition, were entitled to recover on the note discounted, was sustained by the court above.

Admitting the bonds issued by the company, and the trust mortgages created to secure them to be otherwise valid, it is contended that the debts or considerations, which they were given to pay or secure, had an unlawful origin, and that the securities for that reason cannot be enforced. The question of invalidity on the supposed ground of usury, incident to some of the bonds, (those sold at 90 per cent,) has already been considered. A sale of foreign coin, or a purchase of foreign coin, or an ex-

change of foreign coin deliverable in four months, for a less amount of the same coin deliverable in two months, although the difference computed as interest, may be more than seven per cent for the use of the money, unless it be a mere *cover*, and so designed by both parties, is not usurious. In the case of *Leavitt* v. *DeLauny* that was the precise question argued, considered and decided. As to others of the bonds, they were received or held for advances made by the Palmers to take up bills of exchange, which the company were authorized by law to draw and sell, or for moneys paid at the special instance and request of the company to redeem certificates of deposit, which the company had issued, and which they saw fit to recognize. Whether these bills and certificates were strictly binding or not, the company elected to take them up; and having requested the Palmers to advance the money for that purpose, cannot now repudiate the obligation to refund. In my view of the law, however, as already stated, both the bills of exchange and certificates of deposit were legal and binding. They were not currency; they were not negotiated or designed to be negotiated as currency; they were not an infringement of the restriction, admitting it to be applicable to the free banks, which prohibited the issuing of bills or notes, or other evidences of debt, upon loan or for circulation, *as money*; they were not loaned as *money*, nor put in circulation as *money*, nor were they (within the meaning of the statute) put in circulation *at all*. This, it appears to me, as matter of fact, is the inevitable result of the evidence. Mr. Justice Bronson, it is true, in the case of the Cooke certificates, seemingly arrived at a different conclusion. It is not an uncommon thing, however, and not contrary to any rule of law, for a second jury to find a different verdict from the first. A more elaborate investigation of the issue, and a more direct, and perhaps a more sharpened concentration of attention on the exact point of difficulty, is well adapted, and very likely to detect, and when detected to dissipate error. " No man," says Mr. Justice Bronson, (a name whose authority I shall have frequent occasion to invoke,) "no man can feel entirely sure in his conclusions until the subject has been viewed in all its various aspects." *Stare decisis*, I am aware,

is a sound doctrine, but not so stubborn as to exclude every new light. Error, when clearly shown, may be corrected, even when venerable for its years ; much more so in a case of recent impression. How a promissory note (for in that light I am willing to consider these certificates of deposit) for one thousand (and it might as well have been one hundred thousand) pounds sterling, payable *with interest,* twelve months after date *in London,* with a special postscript at the bottom informing the prudent subjects of Great Britain that it was issued in pursuance of, and was secured by a certain deed of trust, &c. ; how, I say, such a document could inflate the currency of the state of New-York, or be circulated here as a bank note, or be capable from any similitude to a bank note, of deceiving the most confiding citizen of this republic, I am unable to perceive. That the issue of such a document in Great Britain, by a company of New-York merchants, should have been denounced by a New-York legislature as a misdemeanor, worthy of fine and imprisonment, is quite incomprehensible. To repudiate the obligation on such grounds, while keeping the fruits of the transaction, were the act done by the shareholders themselves, must, I repeat, strike every ingenuous mind, not perverted by sophistical subtleties, as little better than obtaining so much money from unsuspecting strangers, " under false pretences." Will the courts of this state, after their attention has been directly called to the true character of the transaction, lend themselves, under a doubtful supposed legal compulsion, to such a dishonorable repudiation? Or rather, (for no shareholder interposes directly, and the receiver is the officer of the court,) will they, unsolicited, become, as it were, the repudiators themselves ? One of the judges of Pennsylvania, in a late case, observed, and the sentiment is becoming general, that " he had so great a veneration for the law as to suppose nothing to be law which was not founded in common sense and common honesty." (2 *Yeates' Rep.* 502, *citing* 3 *T. R.* 62, 162.)

Another ground of invalidity is supposed to arise out of the dealings of the company in public stocks. The company, it is said, *trafficked* in stocks, and the moneys, or a portion of them, advanced by the Palmers, were applied to that purpose, with

their knowledge ; and cannot, therefore, be recovered back, or be charged upon the trust securities. It might be a sufficient answer to this objection to say that the Palmers, admitting they knew the purpose, had no knowledge of its alleged illegality. But waiving that point, how does the case stand. It is conceded that the free banking associations by a necessary implication from the express provisions of the law, have the capacity of owning, holding, and transferring state stocks as well as bonds and mortgages ; but they can do so, it is said, as to stocks, only *within certain limits and for certain purposes*. They may purchase, at sales under judgments or hypothecations, to any amount ; they may also purchase to deposit with the comptroller to any amount ; they may purchase to invest their surplus funds, and, as that surplus is at their own discretion, of course, again to any amount. "All these powers (it is admitted in one of the cases cited) are incident to the express power to conduct the business of banking ;" but to "traffic" in public stocks is not given to them. And is the forfeiture of nearly two millions of dollars to turn upon so vague a distinction? No prohibition of the kind is, or is pretended to be, expressly contained in the act. Is then a prohibition, penal in its consequences, to be inferred, under such circumstances, from the want of an express grant of the particular power? And what, it may be asked, is the legal definition of the act of *trafficking* in stocks, as distinguished from taking them without limit in payment of debts, and buying them without limit as a basis of circulation, or as a mode of investing a fluctuating and indefinite surplus? When the company makes a purchase, is the seller to inquire, at his peril, whether they have surplus funds on hand or shortly expected? And is the sale to be valid or void, as to him, according as the company gives a true or a false answer? Is it to be valid if they give a false answer, and void if they give a true one? And what, it may be asked, in such a case is surplus capital? Surplus over what? The indefinite power of investing surplus funds in public stocks, and of buying public stocks to pledge with the comptroller, carries with it, as a necessary consequence, it would seem, the unrestricted power of buying and selling public stocks,

Curtis *v.* Leavitt.

even if such power were not incidental to the general power of banking. To illustrate this proposition : suppose the company to have purchased half a million of Ohio stocks to pledge for bank notes. They return the notes and the comptroller returns the stocks. They then buy and pledge and redeem another half million, and so on from time to time, and perhaps even from day to day, until they become in this way possessed of millions of public stock. They then, from time to time, as convenience prompts, sell these investments. Is not such a course of business lawful? Are not, at all events, the sales made to the company, valid? And if so, (of which there can be no doubt,) what is the process, taken collectively, but a lawful trafficking in public stocks? Too much of this kind of business may be inexpedient, may be imprudent. And so may large discounts to weak friends. But are the legislature and the courts to regulate all the improvidences of commerce? Are they to be the universal guardians of adults as well as of infants? Or rather, when the legislature has purposely abstained from interfering, are the courts to step in and supply the supposed omission? The former body deemed it sufficient to guard the currency, in which the whole community had an interest ; but the latter, it seems, are to supervise the stock market, and protect grown up speculators, not from buying, for that they cannot prevent, but from buying and selling *frequently ;* so frequently as to constitute the vague something called *trafficking !* But what are public stocks, that even trafficking in them, by a free banking association, should be adjudged a misdemeanor? A. loans to the state of New-York, ten thousand dollars, and takes its written acknowledgment of the debt. B. buys the certificate, steps into A.'s shoes, and in effect becomes himself the lender. Subsequently, wanting to discount a friend's accommodation note, he again sells out and substitutes C. in his place. C. then, in effect, has lent the state of New-York ten thousand dollars ; is C. for this act a criminal? and must B., the vender, forfeit his purchase money as *particeps criminis?* And further, (for the present case goes that length,) if C., unconscious as he well might be, of any criminal offense, asks D. (having

bought the stock on a short credit) to advance the $10,000 to take up his notes ; and D., a stranger to our laws, thinking no evil, and not imagining, and having no reason to imagine, that any statutory prohibition existed in, or could, by any subtlety, be extracted from the code of a civilized state against his doing so, makes the advance ; if, I say, D. under such circumstances, pays the acknowledged debt of C. at C.'s special instance and request, shall he be denied a return of his money, and C. be left and protected in the possession of the stock, merely because C., instead of being an " individual banker," was one of an *association* of individual bankers ? and that, too, under a law professing to remove restraints and to establish, except as to currency, a system of *free* banking ?   Even in the case of a usurious or gambling debt, a debt palpably and confessedly illegal and expressly prohibited, if the borrower requests a friend to pay such a debt for him, and gives in return a mortgage to secure the advance, was it ever contended that he could afterwards maintain a bill in equity, to avoid the obligation and cancel the security ? Much iniquity has, no doubt, been done under the plea of usury ; but no case, it is believed, not even that of the Dry Dock Bank, has gone so far as to sanction such a doctrine.   In the case of *Murray* v. *Sands & Judson*, the court of appeals have within a few days decided, " that it is no fraud upon other creditors for a debtor to pay or provide for the payment of a usurious debt." And if money, advanced to discharge an expressly prohibited debt, is the legal basis of a claim, how can that, which has been advanced to discharge a debt, not only not expressly prohibited, but prohibited, if at all, by a very obscure and dubious implication, be denied the same rights ?   The revised statutes (1 *R. S.* 599) enumerate certain powers as belonging to " *every* corporation," and, among them, the power to purchase and dispose of " such personal estate as the purposes of the corporation shall require, not exceeding the amount limited in its charter."   If the free banks, then, be corporations, (which in the sense of the constitution and statutes I respectfully deny,) and are so to be considered, what limit is there on their power to purchase personal estate, if the purposes of banking require such purchase ?   And

why may they not purchase public stocks as within that purpose? Buying state stocks is a common and ordinary investment of bankers; and selling them, from time to time, to private individuals, one of their usual branches of business. Why, then, may not the purposes of the corporation occasionally, at least, require such purchase and sale? And if so, who is to judge of the occasion but the corporation itself, or the officers entrusted with the management of its affairs? Is the judiciary to be called in in every case, to determine whether some vague, indefinable boundary line has been passed or not? Whether the corporation bought too much or too frequently, or at a time when its business did not *absolutely* require it? And must every person dealing with them incur the almost certain peril of a judicial proceeding, and the altogether certain peril of a dubious and fluctuating judicial determination? Such a rule of construction, instead of repressing, would invite litigation. The legislature has, at times, specially prohibited, and at other times specially allowed, particular chartered banks to purchase state stocks according to the views of public policy then prevailing; but in the general banking act they made no express provision either way. They granted certain express powers, and then assumed, by implication, that, under them, the associations would, or at least might, hold public stocks; for they provided for transfers by the associations of such stocks to the comptroller; and, without first acquiring, they could not transfer. The legislature, therefore, said, and the judiciary are bound by the declaration, that in the grant of banking powers unrestricted, was comprehended the power to purchase public stocks. At all events, the language utterly negatives the idea of any prohibition, express or implied. And in that case, the associations, admitting them to be corporations in every respect, would have power under the general corporation law, if not under the general banking law, to purchase public stocks, they being personal estate and within the purposes of banking, provided the amount did not exceed the limit, if any, prescribed in the articles of association; for the general *corporation* law (§ 2) expressly declares that the powers therein enumerated, including the one to purchase per-

sonal estate, "shall vest in every corporation thereafter created."
Whence, then, is derived the supposed prohibition of purchasing
that particular species of personal property called state stocks,
and that particular mode of purchasing called trafficking? I
find none in the statutes. And how is such a prohibition, under
the circumstances, to be executed? Is a purchase, made with
a view to sell again, void? If so, every purchase would be
liable to be invalidated; for every purchase must be made with
a view, some time or other, of re-sale. And yet every purchase,
it is conceded, is not void. How many purchases, then, are re-
quired to constitute a prohibited traffic? One or two, certainly,
are not sufficient. Where, then, does the lawful territory termi-
nate and the unlawful commence? And is it for the judiciary
in every case to prescribe the boundary? Such a discretion
would be as difficult as it would be arbitrary. And what war-
rant is there for assuming, or rather, as it seems to me, for usurp-
ing it? To do so is judicial legislation, neither more nor less;
judicial legislation, too, imposing penalties and forfeitures, and
therefore of the most objectionable species; judicial legislation,
not in harmony with and in aid of the intention of the legisla-
tive department proper, but in hostility to it. For no person, it
is presumed, will deny that the leading object of the act of 1838
was to establish a system of free banking; whereas the tendency
of a certain portion of the judiciary has been and still is to in-
terpolate, by implication, restriction upon restriction, until the
will of the legislature shall be smothered under the will of the
courts. Can any thing, I repeat, be plainer than that the legis-
lature, in the general banking act, authorized the associations
organized under it to transfer to the comptroller, from time to
time, and from time to time to take back again, as often as they,
the association, saw fit, and in amounts as large or as small as
they saw fit, the public stocks mentioned in the act; and is it
not equally clear that such an authority, by the most unavoid-
able implication, carries with it, or more properly speaking,
assumes the existence of, an indefinite capacity to hold such
stocks? Whence, then, comes the limitation, lately announced
from a high judicial source, that these associations " have no

Curtis *v.* Leavitt.

power to purchase state or other stocks *for the purpose of selling them for profit, or as a means of raising money ?"* And that a sale *to* them for such purpose, the object being known to the vendor, entails a forfeiture of both stock and money? I agree with one of the receiver's counsel in commenting lately, as a judge, upon a decision of the court of errors, under what he supposed to be like circumstances, that such an interpolation is a most "unwarrantable usurping of the will of the legislature; and although binding on the parties in that particular case, is not to be followed as a settled precedent." (*Butler* v. *Van Wyck*, 1 *Hill*, 457.) More especially, it seems to me, may we be permitted to deny the "paramount authority," as Mr. Justice Bronson says, of such a decision standing alone, when it conflicts, not with the whole course of previous decisions, for there were none directly on the point, but, what is far more important, with the whole spirit and tenor of the direct legislation of the state; and, when in the language of Mr. Justice Gardiner, slightly varied, the defense, if successful, would give to the association, some hundreds of thousands of dollars of state stocks, or their proceeds, without consideration, and enable them to cast upon *bona fide* creditors the loss arising from the association's own improvidence. (*Ohio* v. *Pell.*) It may be, although many enlightened business men have thought otherwise, that it would have been well for the legislature, in organizing, or, more properly speaking, in authorizing the system of free banks, to have prohibited all dealing by them in state stocks. For myself, I see no particular mischief to result from such dealings, properly conducted, more than from buying gold and silver coin and bullion, and bills of exchange and notes, all of which they have an admitted power to do, and in all of which as well as in state stocks, there is an admitted liability to abuse. What is a certificate of public stock but the written promise of the state to pay the holder a certain sum of money at a certain time with interest? in other words, a promissory note? And does the mere circumstance of the state's being the maker, so poison the paper, that these associations, unable to take care of themselves, should be legislatively, or rather, judicially, protected from its

touch? To an "individual banker" it is conceded no protection was-necessary. He might touch and handle as much as he saw fit. But, and here lies the mystery, if he "associates" with other individual bankers, and they touch in partnership, even if the firm consists of only two members, the danger so changes its character as to require a penal quarantine! Is the legislature justly chargeable with such an absurdity? I think not. The rule laid down by them, it seems to me, is precisely the reverse; and, as Mr. Justice Bronson said in the case of *Butler* v. *Van Wyck,* "if we have not mistaken the true import of the statute, it is not very important to inquire (although the inquiry might well be answered in the affirmative) whether the rule it gives be a salutary one or not." If not salutary, or not deemed so by a majority of the community, members of the judiciary as citizens included, and if persons, so thinking, "must," as Mr. Justice Bronson expresses it, "have relief in some form, it is better that it should be brought about by direct legislation, than by warping existing laws to the exigency (or supposed exigency) of the times." Owing to preconceived opinions and early habits, the struggle to uphold the old system of restraint and monopoly, has been a severe one; and judges of the old school, or at least some of them, "have deemed themselves bound (as one of them expresses it) to see that the stream of justice flowed onward in its accustomed channel," forgetting at times their own admonition, that "if judges had the wish they had not the power to bend the law;" and forgetting also the desire, under other circumstances so strongly felt, "that if the law was to be altered, the change should be made by legislation, and not by judicial decision." (1 *Hill,* 459.) The free banking law was no doubt imperfect. It was the commencement of a new, and for a long time untried, system. Omissions, inadvertent or intentional, in the outset, were to be expected. These omissions, however, whether real or imaginary, were to be judged of, and, if deemed important, to be supplied, as Mr. Justice Bronson expresses it, "by legislation and not by judicial decision." The legislature accordingly, on several occasions, have performed that duty; but on no occasion, although the prohibition had repeatedly been in-

Curtis *v.* Leavitt.

sorted in particular charters of incorporated banks, did they see fit to prohibit the free banks from purchasing state stocks, whether to sell again at a profit, or to remit as a basis of exchange, or for any other purpose, legitimate in itself, and within the scope of banking business. And yet, one of the learned judges of the court of appeals, deeming no doubt the prohibition contained in the monopoly charters to be wise and judicious, and therefore proper to be extended to the free banks, has held that although the free banks have, as he admits they have, the power to purchase state stocks and to hold state stocks, either to transfer to the comptroller, or, by way of investment, yet they "have no power (in other words are prohibited) to purchase state or other stocks for the purpose of selling them for profit;" and that "where the object was known to the vender, and made part of the contract, the debt for the purchase money could not be enforced." (*Ohio* v. *Pell.*) "Statutes," says Judge Bronson, "are usually made to operate prospectively, and do not disturb rights already acquired. But when the law is changed by judicial decision, especially on a question of such widely extended influence as that relating to conveyances of personal property among a commercial people, it is impossible to foresee all the evil consequences which may follow. Such decisions act upon the past as well as the future; and no man can feel secure in a community where that which is settled to-day may be overthrown to-morrow, in a mode which has an *ex post facto* operation, and thus either legalizes acts which were originally void, or makes those things vicious which were faultless when they happened." Judicial changes, even in the common law, which is admitted to be flexible and properly subject to judicial adaptation to the ever changing exigencies of society, can only be wrought out by slow and imperceptible degrees; and when there is any defect which cannot wait this slow process of amendment, "it is for the legislature," as the same learned judge very truly says, "and not the courts, to apply the remedy." Although the case of Pell, as I conceive, plainly departs from the law, as it had been previously settled in *Warner* v. *Beers*, and from the policy, and, as it seems to me, obvious intent of the legislature, it has been,

---

Curtis *v.* Leavitt.

---

and no doubt will again be, strongly urged that, as the decision of a court of last resort, it is a conclusive precedent, which must be followed until the legislature shall change it.    To that objection I answer, in the appropriate language of the receiver's counsel when speaking judicially, "it is going quite too far to say that a single decision of any court is absolutely conclusive as a precedent.    It is an elementary principle that an erroneous decision is not bad law; it is no law at all.    It may be final upon the parties then before the court, but it does not conclude other parties having rights depending on the same question." (Per Bronson, justice, in *Butler* v. *Van Wyck,* citing five or six cases in the late court of errors to maintain and illustrate his position.)    "These examples," says he, "are sufficient to show that our court of *dernier resort* does not regard its own decisions as conclusive by way of precedent; and if not so regarded by that court, it would be strange indeed if other courts were bound to follow them, *at all events,* and without looking into the reasons on which they stand."

The case of the Philadelphia banks, as distinguished from that of the Palmers, has one feature peculiar to itself.    Their claim is attacked, not only on the ground of the alleged illegality of the bonds and certificates of deposit held by them, and which were confessedly (that is the certificates) issued after June 3d, 1840; but also on the ground that these securities were expressly given as collateral to a loan, nominally of $250,000, but really of only $241,250; the difference being, it is said, a usurious premium, and rendering the whole contract void.    It is not denied that the contract arose out of "an application for a loan." It stands, therefore, in that as well as other respects, on a different footing from the case of DeLauny.    The application, however, for the loan, was made, not in this state, but in Pennsylvania; and although the subsequent negotiations were conducted principally in New-York, they had reference to, and were not complete, till ratified in Philadelphia.    By the agreement for the loan, as its terms were finally settled, the $250,000 were to be advanced in Philadelphia currency, then at a discount in New-York of from three to five per cent, and to be repaid in

Philadelphia, with interest at three per cent. Certificates of deposit on time, twelve in number, each for $20,833.33, payable in Philadelphia, were to be given as evidence of the loan, and as a collateral security £67,500 of the first half million trust bonds. In pursuance of this arrangement, the agent in New-York of the Philadelphia banks, at the request of the trust company, paid the latter in New-York funds, deducting 3½ per cent for, and which then actually was, the *bona fide* difference of exchange between New-York and Philadelphia. Was this usury? The loan was, in substance and effect, made in Philadelphia and in Philadelphia bank notes at par, and was returnable at the same rate, in the same place, and in the same currency. If the trust company at the time of the loan lost 3½ per cent, in the sale of these funds for specie, they had, as an offset, the chance of gaining 3½ per cent, and perhaps more, when they came to buy the like funds with specie, at the time of payment; a circumstance held by the court of appeals to be decisive in the case of *Leavitt* v. *DeLauny*. Strictly regarded, every loan made by a bank in its own notes, during a suspension of specie payments, is usurious. Bank notes at such times are always under par, as compared with the legal currency of gold and silver; and to convert them into gold or silver, always requires a sacrifice of a greater or less per centage on the part of the borrower. Yet the courts, looking to the usages of society, the general sense of the community, and the intent of the parties, and to the wide spread evil to result in such cases, from a strict construction of the statute, have invariably held such loans to be valid. A right to repay in depreciated bank notes, a loan made in like depreciated bank notes, whether founded on law or on usage, negatives the presumption of usurious intent. And without usurious *intent* clearly proved or necessarily implied, there can be no *usury*. Hence the same identical transaction, which if *intended* as a cloak would be void, will, if intended as a *bona fide* sale, be valid. No pretense exists in the present instance, for charging the Philadelphia banks with cloaking their real purpose. The purpose, whatever may be its legal character, was open and avowed. It was to make a loan in Philadelphia funds, and to receive it

back again, with six per cent interest, and no more, in the same Philadelphia funds. Such a loan stands upon the same footing as a loan made in New-York funds, during a suspension of specie payments by the New-York banks, repayable strictly in gold and silver, but subject by common understanding to be repaid in like New-York funds. The act of April 6th, 1850, passed immediately after the decision in the case of the Dry Dock Bank, may perhaps be considered as superseding this question. By that act it was declared, that " no corporation (a term which the act provided should for that purpose include the free banking associations) should thereafter interpose the defense of usury in any action." Of course the receiver of the association can stand upon no better footing than the association itself. And as the language is general, and no reason exists for implying an exception, *all* actions are included, whether commenced before or after the passage of the act. So that a defense on this ground, although previously interposed, if not yet acted on, must be disregarded by the court; it being in the nature of a penalty or forfeiture remitted by the legislature and therefore no longer available. (*Dwarris on Statutes,* 676.) See also *Butler* v. *Palmer,* (1 *Hill,* 324,) where all the authorities are cited and ably reviewed by Mr. Justice Cowen. Assuming then, that this loan was not usurious, but that the notes or certificates, given as evidence of it, were nevertheless void under the restraining statute of May, 1840, (a question upon which, notwithstanding the decision in the case of *Palmer* v. *Leavitt,* doubts may be entertained,) " the legal liability, on account of which the notes were issued," to use the language of Mr. Justice Bronson in that case, " still remains." And the Philadelphia banks, or the parties representing their interests, have consequently a right to the benefit of the bonds, (supposing those instruments to be legal,) which were in effect deposited as collateral security, not for the certificates, for *they* were mere evidences of indebtedness, but for the loan, the bonds being themselves secured, a circumstance which alone gives them any peculiar value, upon the trust mortgage.

It may conduce to greater clearness, laying out of view the

objection of usury, to re-state briefly, the Philadelphia case : The New-York Trust Company had executed a series of sterling bonds of £250 each, to the amount in value, nominally, of half a million of dollars ; and to obtain for them credit and confidence, as investments, in the English market, had executed a special trust mortgage or pledge of certain specific assets of the company designated in the pleadings as the first half million trust. These bonds, or a portion of them, having been remitted by the company, several months before, to their agents or correspondents in London, for sale, an order was drawn on them, in favor of the Philadelphia banks, for the delivery of two hundred and seventy of the number, to be held by the banks as collateral security to the loan of $250,000. The case then stands thus : The New-York company borrows in Philadelphia $250,000 at 6 per cent, gives its note, at say 12 months, for the amount, and places 270 mortgage bonds in the hands of the lender as collateral. Upon these facts, waiving the point of usury, we are called upon to say that the loan was void, because the company could not borrow ; that the note was void, because the company could not issue or put in circulation bills on time ; that the bonds were void, because the company could not borrow nor issue paper on time without a wax seal ; nor make a trust mortgage, such as the one complained of, and of which the bonds are, in effect, a component part.

All these objections, it will be seen, have already been considered, partially at least, in connection with the claims of the English creditors. The only difference not considered—although even that, perhaps, is not a difference in principle—arises out of the form of the Philadelphia certificates of deposit, and their being expressed in dollars instead of pounds sterling. But, on the other hand, the greater magnitude of the amounts in the Philadelphia case, and their fractional character, negatives, if possible, still more strongly, the idea of their being used as a currency. A promissory note of $20,833.33, in the form of a certificate of deposit, payable in Philadelphia in twelve months, with interest, it would seem, could hardly require the intervention of the legislature of the state of New-York, to prevent its

Curtis *v.* Leavitt.

circulation as money, or be the proper object of denunciation as a misdemeanor, when given by a banking company having the legal right to receive deposits on interest, and of course to give the usual and customary evidences of such deposits. Having been a member, and not altogether an inactive one, (especially on this subject,) of the legislature of 1840, I may be permitted, perhaps, on a question of doubt, to allude briefly to its doings and intentions. Two of the most prominent and exciting topics under the consideration of that body, as its journals show, were the defects of the currency and the alleged unconstitutionality of the free banking law of 1838 ; and one of its first resolutions was an order directing the clerk of the assembly "to procure a copy of the opinions delivered by the judges of the supreme court" on the constitutional question in the case of *Thomas* v. *Dakin*, then recently decided by that court, and a few weeks after, in effect, reversed by the then court of errors. On the 18th of February, Mr. Lawrence, from the bank committee of the assembly, reported a bill, entitled, "An act to equalize and *regulate the currency of the state of New-York*." On the 17th of March, the committee of the whole, as the journal expresses it, reported progress "on the *currency* bills." On the 24th "the currency bills" were announced to be in order ; and on a motion to go again into committee on those and other bills, "Mr. Roosevelt (says the journal) moved to amend by striking out all except *the currency bills*." Again, on the 30th, the house went into committee on the *currency bills*. So also, on the 7th of April. On the 13th, the house went into committee on the bill entitled as above, and after making some alterations and amending the title, so as to read, "An act to amend the act entitled an act to authorize the business of banking," ordered it to be engrossed. It subsequently underwent some further modification, and was finally passed on the 14th of May, by both houses, under the title as last amended above, and so stands at present in the statute book. Through all its stages, as will be seen, it was a *currency* bill. Its object and motive was the regulation of the *currency;* not the currency of Great Britain or Pennsylvania,

but "the currency *of the state of New-York.*" Hence, in its concoction as in its final passage, the terms "issue and put in circulation" were used, and unalterably adhered to ; terms which had acquired a sort of legislative meaning, and which, it might almost be said, had received a legislative definition, confining them to currency. As late as the immediately previous session of 1839, in the prohibition as to foreign bank notes, it was made unlawful "to receive, pay out, give, or offer in payment, *as money* or to *circulate*, or attempt to circulate, *as money*, any bill, note, or other evidence of debt," of the description referred to ; or to procure "any bank bill or note or other evidence of debt *in the similitude of a bank bill* or note; *issued*, or purporting to have been issued, and with the intent to issue and pay out, or in any way to utter or *circulate* the same *as money*," &c. And even in an act of the same session of 1840, we find expressions, "issuing bills or notes of circulation," redeeming "circulating notes issued," paying on demand "all circulating notes issued," &c. The 26th section of the first article of the revised statutes on moneyed corporations provided also that "no corporation having banking powers should (shall) *issue for circulation* any bill or promissory note of a less denomination than one dollar." Can there be a doubt then, I repeat, that when the legislature, in the act under consideration, used the term "issue" in connection with the words "or put in circulation," they meant, as in the revised statutes and in the act of 1839, an "issue for circulation," "for circulation as money ?" and that "any bill or promissory note," not in "the similitude of a bank bill," and not adapted for circulation as such, and not actually circulated as money, was exempt from its prohibitions ? The trust company in question, like other free banks, were, in express terms, authorized to sell exchange, whether on demand or on time ; and what is a certificate of deposit drawn in New-York and payable in Philadelphia but a bill of exchange ? especially a certificate for the large and fractional sum of $20,833.33 ? And what evil could possibly result to the community from allowing banking associations to exercise their natural and common law right of giving such a certificate or selling

such a bill, *bona fide*, even if it were payable sixty days after date or with interest? And if none, why should the legislature make the doing so a misdemeanor? Did "the currency of the state of New-York" require the application of fine and imprisonment and forfeiture to protect it from such a harmless invasion? Still it is proper to add that if the principle of the decision in the case of *Leavitt* v. *Palmer,* originating as it did in this court, is not to be re-considered, even such a note is within the prohibition of the act, and void, although the legal liability, in that event, on account of which it was given, and, of course, the legal right to hold the mortgage bonds as security, would " still remain."

The substance of the views above expressed, with slight additions, may be summed up as follows :

*First.* Joint stock associations, formed by articles of co-partnership, entered into and registered according to the free banking law, although possessed like other special partnerships, of certain corporate attributes, are not corporations within the meaning of that provision of the late constitution of the state, which prohibited the legislature from " creating any body politic or corporate," without a two-third vote in each particular case.

*Second.* Although legislative enactments of an ordinary remedial or directory character, in reference to corporations, as such, may, perhaps, notwithstanding be applicable to such " associations," provisions creating misdemeanors and imposing penalties and forfeitures, cannot be so extended by implication, without violating a fundamental rule in the interpretation of statutes, and virtually enacting an *ex post facto* law by judicial legislation.

*Third.* The act of May, 1840, which extended *one* of the previous penal regulations for the government of moneyed corporations to the free banks, making it a misdemeanor for them to issue bills or notes on time or interest, was in effect a legislative assertion, binding on the judiciary, that such regulations did not previously apply—and that none, except the particular one so expressly selected should thereafter apply—to the free

banks.   And the whole series of subsequent enactments is in conformity with this exposition.

*Fourth.* The North American Trust and Banking Company had power to borrow money to the extent of its actual and lawfully authorized capital, as a necessary incident of banking, and as resulting, by necessary implication, from the express power, unrestricted, to receive deposits, to sell exchange, to buy gold and silver coin, and to issue and redeem a circulating medium, payable on demand, while the funds specially appropriated for its security, were by law placed beyond the control of the institution issuing it.   Hence, the bonds and other obligations of the company, given as evidences of such loans, and the trust mortgages collateral to them, (unless they can be otherwise successfully impeached,) are valid instruments.

*Fifth.* The statute of 1830, prohibiting corporations when insolvent or in contemplation of insolvency, from making assignments, with the intent of giving preferences to particular creditors, and declaring every violation of such prohibition to be a misdemeanor, has no application to this association; and as a matter of fact, this association was not insolvent at the time in question, nor did it make the assignments in contemplation of insolvency, and the trust deeds or mortgages in question were not executed with the intent of creating a preference, but to obtain further indulgence and larger advances, and to enable the company by cash means to pay all its debts, and to transact a business more profitable to its stockholders.

*Sixth.* The statute which declares that conveyances and assignments of personal property, "*made in trust for the use of the person making the same*," shall be void as against creditors, has no application to trust mortgages made *bona fide* to *raise money* to pay creditors.   Although the surplus in such cases, after satisfying the mortgage debts, may, by way of resulting trust, or by express stipulation, be for the use of the mortgagor, that is not " the motive for creating the trust, nor the purpose intended to be effected by it."   The statute relates, and purports by its title to relate, solely to *fraudulent* conveyances and contracts," whose object is to cover up the debtor's

property from the eye of creditors, while retaining it in fact for the debtor's use.

*Seventh.* The provision, in the same statute, which declares that every assignment of "goods and chattels," by way of mortgage, unless accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things mortgaged or assigned," shall be presumed to be fraudulent, applies only to goods and other things of which *possession* can properly be predicated, and not to what the law denominates *things in action,* as contradistinguished from things in possession.

*Eighth.* As matter of fact, obvious from the whole evidence in the case, and so the court find, these assignments or mortgages were not made "with the intent to delay, hinder, or defraud creditors." Every mortgage, in some sense, delays and hinders creditors; but not in the sense of the statute of frauds. Delay and hindrance are the incidents and not the motive of the deed. Its object, when honest, is to secure the lender, and not, except incidentally, to benefit the borrower. Such an object being lawful, and a trust mortgage being a lawful instrument to effect it, "delay to creditors necessarily resulting from a fair exercise of these rights (in the language of Mr. Justice Gardiner) is not prohibited by any statute."

*Ninth.* As no "board of directors," nor any board analogous to a board of directors, was required "by law" for the free banks, the provisions of the revised statutes forbidding the making of certain transfers by any moneyed corporation without the sanction of a previous resolution of its board of directors or manager, is, for that reason, inapplicable; even admitting the association to be, in other respects, a corporation, within the meaning of the statute.

The act intended that these associations, like other partnerships, should be governed by themselves, and not by "persons having *by law* (for such is the definition of directors in the revised statutes, vol. 1 p. 559, § 53,) the direction or management of the affairs of any such corporation."

*Tenth.* The trust mortgages, if necessary, were sufficiently

sanctioned or ratified by the association, or by the persons whom the association appointed or allowed to have the direction and management of its affairs.

*Eleventh.* The bonds issued upon, and secured by, the trust mortgages, were sufficiently sealed; at all events, they were not "bills or notes" within either the letter or the meaning of the act of 1840. The court of appeals in the case of DeLauny, having held that it was lawful for the trust company, even after the act of 1840, to give a promissory agreement, not under seal, for the future payment or delivery of foreign coin, have in effect qualified, if not tacitly overruled, their previous expression of opinion and that of the supreme court, in the case of *Palmer* v. *Leavitt.*

*Twelfth.* The true construction, as we conceive, (independently of authority,) of the act of 1840, is that the "issue and circulation" thereby intended to be prohibited, was that of bank notes proper; or of notes which were likely to enter into, and being on time or interest, to affect injuriously the circulating medium of the state. It was an extension of the policy of the act of May 7th, 1839, which made it unlawful for any "incorporated banking institution," or any "association authorized" by the general banking law, "to receive, pay out, give, or offer in payment *as money,* or to circulate or attempt to circulate *as money,* any bill, note, &c., issued by a foreign bank or banker, and made redeemable in this state, to the like issuing and putting into circulation *as money* of all notes of domestic bankers, as such, made payable *on time or with interest.* It denounced as unlawful, not the giving or receiving of such notes, but the giving or receiving of them *as money.* The notes, therefore, which come within the prohibition, must not only be on time or interest, but as the act of 1839 expresses it, "in the similitude of bank notes," or adapted for circulation *as money.* The English creditors in the present case, and the same may be said of the Pennsylvanians, did not know in point of fact, nor had they, as the evidence shows, the least suspicion, that they were violating, or aiding in the violation of, any law of the state of New-York;

and they cannot therefore be deprived of their property on the assumed ground of any such knowledge.

*Thirteenth.* All the bonds, we find, as matter of fact—for such is the weight of evidence—were executed and delivered, and took effect, before the statute prohibiting time notes as a currency went into operation; and were exempt, therefore, from its provisions, even if otherwise applicable to such securities.

*Fourteenth.* The certificates of deposit for $20,833.33, each payable with interest in Philadelphia, were not "bills or notes issued or put into circulation" within the meaning of the act of 1840, to regulate the currency of the state of New-York. They were not issued as money, nor adapted to circulate as money, *in* this state or *out* of it.

*Fifteenth.* The six per cent bonds sold under par in England, they being payable in England and in English coin, were not usurious. Under the written agreement set forth in the case, the transaction was, in effect, an exchange of credits, or a sale of foreign coin or foreign exchange, payable or deliverable at a more distant, for a less amount of the same coin payable or deliverable at a less distant date; or, more properly speaking, an exchange of the chances of a future rise or fall in the gold market.

*Sixteenth.* At all events, the English claimants under the trusts, having made *bona fide* advances, at the request of the company, to pay their sterling exchange and sterling certificates, (another name for the same thing,) have valid debts against the company for such advances, and valid claims upon the securities pledged to the trustees for their benefit, to the extent of such advances. Where a party pays the debt of another, at his request, although the debt be void for usury or any like cause, it is no defense against the claim of the party making the advance, to be refunded.

*Seventeenth.* The loan, made *bona fide* by the Philadelphia banks on suspended bank notes, returnable by tacit understanding in the like currency, although the borrower immediately sold the notes for specie at a discount, is not usurious; and the

lender has a valid claim for repayment in similar notes or their equivalent in specie.

*Eighteenth.* No receiver of any corporation or of any free banking association, since the act of 1850, can plead, or set up, or prove, or in any manner "interpose" the defense of usury. And the act, being in the nature of a repeal of penalties and for-feitures, and containing no reservation, express or implied, ope-rates as well on existing as on subsequent suits; extinguishing, not only the right of pleading such defense thereafter, but of urging or maintaining the plea, although previously put in, if not already allowed and established.

*Nineteenth.* The general banking law, in its provision for the deposit, from time to time, with the comptroller, of state stocks to an unlimited amount, assumes, and, therefore, in legal intend-ment, declares that the associations to be formed under it, and who were to make such deposits, had, and were intended to have, authority, in virtue either of the specific or of the incidental banking powers expressly conferred upon them, to acquire and hold such stocks in the same manner, and for the like purpose, as other individuals, whether singly or in partnership, carrying on business as private bankers. The Palmers, at all events, had no knowledge, in fact, nor, being foreigners in a foreign country, are they chargeable with any knowledge in law, that the moneys advanced by them for the company, although used in part, di-rectly or indirectly, in payment for public stocks, were so used in contravention of any statutory prohibition, if such there be, existing in the state of New-York; and especially are they not so chargeable, if the alleged prohibition be the result, not of express language, but of judicial interpretation, and would, if applied, involve a penalty or a forfeiture of the debt.

*Twentieth.* The claims of the trustees for compensation, for their services and responsibilities, one of them having been a director and officer of the company, ought not to be adjusted by the agreement alleged to have been made, but should be sub-mitted to a referee to inquire and report what amount, under all the circumstances, would be reasonable and just.

*Twenty-first.* The receiver having acted under the advice of

counsel, and the case having involved numerous and difficult questions, the costs on his part, as well as on the part of the claimants, should be paid out of the fund in dispute.

A draft decree should be prepared, in conformity with the foregoing directions, and submitted for the approval of the court.

MITCHELL, J.   The act of 1850, (*ch.* 172,) is that "no corporation shall hereafter *interpose* the defense of usury in any action." The second section makes the act include all associations having any of the powers and privileges of corporations, not possessed by individuals or partnerships; and so includes the free banking companies. The act is, not that they shall not *plead* the defense of usury, but that they shall not *interpose* it; that is, by plea, or at the trial or hearing. These corporations and associations are the creatures of the legislature, and hold their charters subject to the right of the legislature to repeal, alter, or modify them. The legislature, therefore, may impose this restriction upon defenses, even as to contracts previously made; especially as it has always been deemed a principle of equity that the one receiving money on an usurious contract should refund the amount with legal interest. For this, and other reasons, the defense of usury is not made out in this case; it is not pleaded with such exactness as is required to admit the defense.

The certificates of deposit and bonds issued by the company were not issued for the purpose of *loaning* them, or putting them *in circulation as money ;* and so are not within the prohibition of 1 R. S. 712, § 7. The bills and notes referred to in § 35 of the safety fund act, (*Laws of* 1829, *p.* 178,) are bills or notes issued for circulation as money. The instruments issued under the assignments (if not bonds) are not notes or bills, and were not issued for the purposes of circulation. They were to be issued, principally, in England, and as bonds. The sterling bonds were to be used in England, and, therefore, were not within the prohibition of the restraining act. (1 *R. S.* 713, § 9, [10].)

The act of 1840, (*ch.* 363, § 4,) prohibits the free banks from "issuing or putting in circulation, any bill or note of the associ-

ation," unless the same shall be made payable on demand, and without interest. This does not apply to mortgages, nor to bonds, obligations or contracts, such as usually accompany mortgages, nor to the bonds issued in this case. It was rather assumed than decided in *Leavitt* v. *Palmer*, that similar certificates were so prohibited; but the contrary was assumed in the same court in the later case of *DeLauny* v. *Leavitt*, (4 *Comst. Rep*. 364.)

The assignments were not against the spirit or policy of the general banking law. They were made to procure funds to carry on banking, and to pay debts. Nothing, on the face of the bonds or certificates, shows that they were issued against law. A *bona fide* holder would, therefore, be protected if the company could lawfully issue them. (*Safford* v. *Wyckoff*, 4 *Hill*, 442.)

The company is not shown to have been insolvent in fact, when the assignments were made. The insolvency mentioned in the article of the revised statutes as to proceedings against corporations in equity, (2 *R. S.* 463,) and also in the article as to moneyed corporations, does not mean a mere inability of the company to pay its debts, but an inability, which is acknowledged by its directors or managers, or manifested by some public or overt act. In the article as to moneyed corporations, (1 *R. S.* 591, § 9,) the words "when insolvent," are coupled with the words "or in contemplation of insolvency." The last expression, evidently, is intended of the contemplation, not merely of an inability to pay its debts, but of the consequent suspension of its business. The last use of the words explains the meaning of the first. At the time of these assignments, the company not only did not contemplate insolvency, or execute them with a view to give a preference to creditors, but believed that the effect of the assignments would be to furnish immediate means to pay all the debts of the company without any preference, and to enable the company to raise a cash capital, with which it would do a business profitable to its stockholders, as well as safe to its creditors. Section 9 of 1 R. S. 591, therefore, does not affect the assignments. The assignments were, in fact, authorized by those officers of the association to whom their articles intrusted

Curtis *v.* Leavitt

that power. Under section 8 of 1 R. S. 591, an assignment is valid whenever the resolution of the board of directors sanctions it; and if they sanction it after it is executed, their sanction retroacts so as to make it originally valid.

The assignment is also valid, " in the hands of a purchaser, for valuable consideration, and without notice," (1 R. S. 591, § 8,) although there be no previous resolution of the board of directors. This protects every purchaser, or lender, who receives, or becomes interested in a deed, assignment or other conveyance, executed with the usual formalities of deeds by corporations, viz : under the seal of the company, and signed by its president and cashier, or other proper officer ; and, whenever the purchaser or lender advances his money without knowledge that the instrument was executed without the previous resolution of the directors. The saving clause makes no exception as to the character of the purchaser, whether he purchase directly from the company, or from a grantee of the company. A different rule would embarrass all titles derived from companies, and be incompatible with the safe and expeditious transaction of business.

The company had the power to borrow money, as incident to its general powers, and to give certificates acknowledging the loan.

The Palmers did nothing to aid the company to purchase or traffic in state stocks. The payment, at the request of the company, of debts already contracted by the company for such purchases, gave the Palmers a right of action for the money thus paid at the request of the company.

The assignments in this case were not made to defraud creditors, but to transform certain securities less available into cash for the purpose of paying all the creditors of the company, and using the surplus in the business of the company; which they were authorized to carry on. They were not within the meaning of 2 R. S. 135, § 1, in trust for the use of the person making the same. The safest construction of that statute would be to hold that it made void the conveyance, only so far as it violated the statute. Then the valid trusts would be saved, and the legal estate in the residue of the assigned property would remain undisposed of, and as much within the reach of the

creditors as if that particular trust had not been declared. This also would satisfy the words of the act, and would make void the assignment made in trust for the use of the person making the same. If there were fraud in fact, that would vitiate the whole instrument, as the corrupt intent must pervade the whole; but when there is no fraudulent intent, and only a declaration of the trust, which the law would have implied, it comports best with the generally conservative character of the decisions of our courts to hold nothing void except the part which the law forbids. Decisions from our highest court were quoted as sustaining a contrary opinion. They differ from this case, and are so much qualified by a subsequent decision as to leave the question open, or in favor of this assignment. In *Goodrich* v. *Downs* (6 *Hill,* 438,) the assignor was actually *insolvent,* and the assignment provided that, if any surplus remained, it should be paid over to him, and there were preferred creditors. Here the assignor was not insolvent, and the assignment was not to give a preference. In *Barney* v. *Griffin,* (2 *Comst.* 365,) the assignor was also insolvent, and the assignment was for preferred creditors. Bronson, J., seems to admit that the assignor may declare the trust for himself after all the creditors are paid; he says, " the debtor can neither make terms, nor *reserve* any thing to himself, *until after* all the creditors have been satisfied." That also was an assignment of real estate, and *Goodrich* v. *Downs* an assignment of personal chattels, things which may be reached by execution; but this is of choses in action only, which are not liable to an execution, and (when the assignments were made) could only be reached through a court of equity. In *Leitch* v. *Hollister,* (4 *Comst.* 214,) Gardiner, J., notices that the assignment was by an insolvent debtor, and places the former decisions on the ground that the trust " withdrew the property of the debtor from *legal* process, and so compelled the creditors to await the execution of the trust before they could reach the surplus reserved to the former." When the property, as in this case, could not be reached by *legal* process, the assignment does not compel any " awaiting" or delay that the law does not attach to such property whether assigned or not.

---

Curtis *v.* Leavitt.

---

Justice Gardiner speaks of the principles laid down by him as applicable to express "trusts created by an *insolvent* for the benefit of a part of his creditors," but he excepted in that case (and the court concurred with him) an assignment of a claim in suit, made by a debtor to three persons, to each of whom severally he was indebted in three several sums ; the amount when recovered to be applied in paying the indebtedness to *each* of the assignees, and the balance to the assignor. It may be said of these assignments, as of the one in that case ; " the conveyance, whatever may be its form, is in effect a mortgage of the property transferred. A trust, as to the surplus, results from the nature of the *security*, and it is not the object, or one of the objects of the assignment. Whether expressed in the instrument or left to implication is "immaterial." The property assigned was a chose in action, and that any creditor would, (we add,) on having his execution returned satisfied, be at liberty to redeem or require a sale of the assigned property subject to the rights of those creditors who had acquired rights under the assignments ; and that any creditor "has therefore not been hindered, or sustained any other injury than that he has been postponed to other creditors equally meritorious with himself."

Those who advanced moneys on the credit of the assignment should be protected. A deed to a daughter may be voidable at the suit of the creditors of the grantor, but will be sustained in favor of one who marries the daughter with knowledge of the deed being executed to her. A mortgage to secure *future* advances is valid to the extent of such advances as are made before notice is given of other *rights ;* an ante-nuptial settlement in trust for the grantor until marriage, then in trust for his wife for life, and to her issue. in fee, and on her death without issue, surviving in trust for the grantor and his heirs, has always been deemed valid to the wife and her issue. If the wife, and her issue, are deemed creditors or purchasers on the faith of the settlement, so are those who, in this case, lent money, or parted with value, or bought the certificates on the faith of the assignments.

Curtis *v.* Leavitt.

Section 6 of 2 R. S. 136, requiring an immediate delivery, followed by an actual and continued change of possession, on an assignment, or that the assignment shall be presumed frauduluent, applies only to goods and chattels and not choses in action; the last only were assigned in this case; besides, the assignments were made in good faith in fact.

The amounts to be recovered should be only the amounts paid to or for the company by the person receiving the security, or due to him by the company, with interest. The costs of all parties should be paid out of the fund, with reasonable counsel fees to be certified by a referee, on notice to all parties.

EDWARDS, J. I concur in the conclusions stated in the opinion of my associates, so far as they are embraced in the following propositions: I. The provision contained in the trust deeds, that the trustees should hold the securities assigned to them, in trust for the company, until default should be made in the payment of its bonds, was not in contravention of the provision of the revised statutes, which declares, that all deeds of gift, assignments, &c. made in trust for the use of the person making the same, shall be void as against the creditors, existing or subsequent, of such person. (2 *R. S.* 135.) (1.) It presents a different case from that which the statute was intended to provide against. (2.) The creation of a trust in its favor was not the principal object which induced the company to execute the trust deeds; it was not even one of the objects. It was rather one of the incidental consequences of a transaction which, in itself, was legal. The bonds were not to be transferred until after the execution of the trust deeds; and, until such transfer, the company must have had a resulting interest in the securities assigned. (3.) As soon as the bonds were transferred, the holder of them acquired an interest under the trust deeds, and the trustees became bound to hold the assigned property for the benefit of such holders, until the payment of the bonds. Before that event occurred, the trustees could not re-transfer the securities to the company. (4.) The object of the statute was to prevent the creation of a nominal title in the grantee, where the

real title was in the grantor, and it was intended to apply to cases where pretended titles were created for the purpose of avoiding the claims of creditors. According to its true spirit and meaning it does not, and was not intended to apply to a case in which the resulting trust is merely an incident, arising out of the nature of a transaction in itself legal and proper, and in which there is neither bad faith, nor fraudulent intent.

II. The trust deeds were not made with the intent to hinder, delay or defraud creditors, and are not void under the provisions of section one, title three, chapter eight, part two of the revised statutes. (2 *R. S.* 137.) The evident object and intent of the company was to enable itself to raise money to pay its debts; and neither the assignor, nor the trustees, nor the *cestuis que trust* intended to hinder, delay or defraud the creditors of the company. The mere reservation of an interest in the securities assigned until default should be made in the payment of the bonds, does not, either by itself, or in connection with the facts of the case, show a fraudulent intent.

III. The trust deeds are not fraudulent and void under section four, title two, chapter seven, part second of the revised statutes. (2 *R. S.* 136.)

IV. At the time of the execution of the trust deeds the company was not insolvent within the meaning of the provisions of section nine, article one, title two, chapter eighteen, part one of the revised statutes. (1 *R. S.* 591.) (1.) The rule as to what constitutes insolvency under this statute, must, in some measure, be governed by the circumstances of the particular case. The party making the assignments, in this case, was a voluntary banking association. It had commenced its business upon a new system, with a very small and inadequate cash capital. Under these circumstances it became necessary to obtain cash funds to enable itself to carry on a banking business. In order to do this, it resorted to means which its officers supposed would remedy the defects inherent in its organization, but which, as the result shows, proved ineffectual. Whenever its debts became due it was obliged to resort to loans, or other similar means, for the purpose of meeting them. This was the case from the

Curtis *v.* Leavitt.

beginning. But, although it had not available cash capital, it had securities upon which it could borrow, and had borrowed money sufficient to enable it to discharge its accruing liabilities. Such being the case, the same rule ought not to be applied to it for the purpose of testing its solvency, in the legal sense of the term, as would be applied to a merchant or trader. It had succeeded in meeting its engagements up to the time of the execution of the assignments in question, and the proofs do not show that its assets were not sufficient at that time to pay all its debts. It was still carrying on its business, and it is evident that its officers had the confident expectation that it would be able to continue to do so. The letters of some of its officers which were relied upon to establish a different conclusion, contain earnest appeals to their foreign correspondents to assist the company in carrying out the scheme which it had adopted for the purpose of raising cash means, but they do not show that insolvency was contemplated. There was no necessity for these appeals for assistance if the company had contemplated a state of things which would render such assistance of no avail.

V. Assuming, as I think we are bound to do since the decision in the case of *Gillet* v. *Moody*, (3 *Comst.* 487,) that the provisions of the revised statutes in reference to assignments by moneyed corporations (1 *R. S.* 591, § 8) apply to banking associations, then the question arises whether the assignments called the million and first half million trusts were duly authorized by a previous resolution of the company. (1.) The resolution of the 6th January, 1840, was a sufficient authority for the execution of the million trust. (2.) After the passage of this resolution, it was deemed advisable, for good reasons, to make a change in the trustees, and to add the London trustees. This change was not inconsistent with the end and purpose of the original resolution; and, having been acquiesced in by all persons interested in the company, and third persons having parted with their property upon the faith thereof, the receiver of the company should not be permitted to repudiate the acts of the trustees, and much less, to avoid the trust deed. (3.) The securities to be assigned were, by the resolution of the 6th of

January, 1840, to be selected by the president, counsel, and second cashier of the company. Those officers were not limited as to the amount of securities, but were authorized to select an amount, "as nearly equal to the amount of certificates as practicable," which were to be held "as an indemnity for the holders of the certificates." The selection of a sufficient amount of bonds and mortgages to cover the difference of exchange between New-York and London, made, as appears, in entire good faith, was authorized by the true spirit and meaning of the resolution. The indemnity of the bondholders was the object of the assignment; and if sufficient security had not been furnished to them, there would have been a want of good faith on the part of the company. (4.) But if there had not been a sufficient resolution of the board of directors, previous to the 30th of July, 1840, the resolution of that date made the assignment operative and valid from the time of its passage.

VI. The first half million trust was also duly authorized by the resolution of the 30th July, 1840, and became operative and valid from that date.

VII. The bonds of the company were not issued for the purpose of being loaned, or put in circulation as money, and are not within the prohibition of 1 *R. S.* 719, § 7.

VIII. The act of 1840, (*ch.* 363, § 4,) which prohibits banking associations from *issuing* or *putting in circulation* any bill or note of the association unless the same be made payable on demand, and without interest, does not apply to the bonds which were negotiated in this case.

IX. The company had the right to borrow money, and to secure its payment, by giving its bonds in the manner that it did, secured by a pledge of its assets.

X. The company had the right to transfer its funds to Palmers & Co., in the manner that it did. (1.) The resolution under which the bonds were issued states that "it is expedient, and the company are hereby authorized to issue nine hundred bonds," &c. Nothing is said about negotiating them; and the recital in the trust deeds that it was intended that they should be negotiated, did not require the company to negotiate them

Curtis *v.* Leavitt.

otherwise than it did. (2.) Beers and Murray had a right to negotiate them; and having negotiated them for the company to its creditors, as security for their debts, such creditors are entitled to claim under the trust deed. (3.) The bonds were pledged with Palmers & Co., to secure them for advances made, and to be made, and as an inducement to them to make the advances. They were distinctly pledged by Murray, who was the general agent of the company, and was expressly authorized by the president to pledge them. The certificates of the company were falling due, and this was the only resource it had for discharging them. Palmers & Co. not only made advances, but they gave up state stocks. (4.) The pledge of the new bonds was in substitution for those which had been before pledged, and was legal. (5.) The pledge to Holford & Co. being for a debt due to them, and being made by Murray, the authorized agent of the company, was legal.

XI. The bonds ought not to be declared void on the ground of usury.

XII. There was a sufficient compliance with that provision of the statute which requires that a contract made by a banking association shall be signed by the president and cashier, in their signing the bonds without signing the indorsements.

XIII. The debts, for the security and payment of which the bonds were given, were valid. (1.) The fact that the money loaned by Palmers & Co. had been secured by state stocks illegally purchased, or had been used to pay for such stocks, did not render their debt illegal. (2.) Neither the consent signed by Palmers & Co., nor the order made by the chancellor, precludes this court from inquiring into the validity of the debts of Palmer & Co.

XIV. The debts of the Philadelphia banks are valid.

XV. The million and first half million trust deeds, and the bonds mentioned in the original bill of complaint, are valid. The title and claim of the plaintiffs in the original bill in and to the mortgages and other property assigned to them by the said trust deeds, and to the avails and proceeds thereof, are valid. The holders of the bonds mentioned in the original bills,

have a valid claim against the company, and are entitled to be paid the amount thereof, with interest, out of the securities assigned to the trustees. The trustees are entitled to a reasonable compensation for their services. The cross-bill should be dismissed. The costs of all the parties to the original and cross bills should be paid out of the securities and property assigned to the trustees, and a decree should be entered accordingly; with such other provisions as shall be necessary to carry out the principles and conclusions above stated.

[NEW-YORK GENERAL TERM, December 31, 1853. *Edwards, Mitchell* and *Roosevelt*, Justices.]