## CASE OF THE MECHANICS' BANK OF WILLIAMS-BURGH.

*Supreme Court, Second District; Special Term, October,* 1857.

BANKING CORPORATIONS.—INSOLVENCY.—WHAT CONSTITUTES.—DEFENCE.

The mere failure of a bank to pay a debt due from it on demand, is not sufficient to authorize proceedings to be taken against it, under section 7 of Laws of 1849, ch. 226.

The fact of refusal to pay, continued after the ten days specified in the act, is not conclusive evidence of insolvency; it only shifts the burden of proof from the applicant to the bank.

Wherever the existence of a good defence to the demand of the creditor of a bank is made to appear on proceedings under section 7 of Laws of 1849, ch. 226, the proceedings taken must be dismissed.

Where the demand of a creditor of a bank was for payment of a sum of money held by the bank, but claimed from them also by third parties,—*Held,* that the bank showed a good defence to the claim, within the meaning of the statute, and that the title to the fund could not be tried in the proceedings against the bank.

Order to show cause why an order should not be made declaring the Mechanics' Bank of Williamsburgh insolvent, and appointing a receiver.

The facts involved in the case appear sufficiently in the opinion of the court.

*J. L. Campbell*, for the motion.

*J. Sparks* and *J. A. Lott*, opposed.

BIRDSEYE, J.—On the 21st of October instant, affidavits made by William B. Lewis, comptroller, and Crawford C. Smith, treasurer of the city of Brooklyn, were presented to me, which alleged in substance that a debt was due from the Mechanics' Bank of Williamsburgh to the city of Brooklyn, payable on demand, amounting to $14,694.16, with interest from October 20, 1853, at the rate of four and one-quarter per cent. per annum; that on the 10th day of October instant, a draft or check on said bank for $16,000, signed by the mayor and comptroller of the city of Brooklyn, payable to the order of, and endorsed by, C. C. Smith, the treasurer of that city, was presented to the bank, and the payment of that sum duly demanded from the bank; that payment thereof was refused, and that no payment had since been made.

It appearing upon these papers that a proper case had been made, within the 7th section of chapter 226 of the Laws of 1849, the "Act to enforce the responsibility of stockholders in certain banking corporations and associations," &c., an order was made by me requiring the bank to show cause before me, on the 26th day of October, why the bank should not be declared insolvent, and a receiver of its property appointed, and why an injunction should not be granted to restrain the association and its officers from transacting any business, &c. No facts were presented in the affidavits from which I could infer that there was any fraud or injustice designed on the part of the officers of the bank in such refusal. No order for a temporary injunction was granted, therefore; it being my opinion that no case for the making of such an order had been shown. The 7th section of that act, after specifying the cases in which an application like the present may be made, provides that "if in the opinion of such judge, upon the facts presented, it be expedient, in order to prevent fraud or injustice, he may grant an order for a temporary injunction, restraining such corporation," &c., in the manner pointed out in the statute. It seemed

obvious that some other "facts" than the mere failure or refusal to pay a debt for the period of ten days were requisite in order to warrant the court or judge in putting a stop by injunction to the operations of such an institution. If the failure of the bank to meet promptly its obligations has been caused by fraud on the part of its officers, or if there be just reason to believe that they intend any "fraud or injustice" to the creditors of the bank, the "facts" must be "presented" affirmatively, in order to justify the interference of the court by injunction.

It is not to be overlooked that mere failure or refusal to pay a debt on demand is not sufficient ground for proceeding against a bank under the stringent provisions of this section. It is only "after ten days from the time of the refusal" to pay the debt of the bank, that the application can be made for an order declaring the corporation insolvent. The Legislature seem to have supposed that every such institution might be in danger, at some period, of being temporarily unable to meet at once all its obligations, if presented simultaneously for payment. A reasonable time must be given to enable the bank to convert its assets, and provide for claims which may perhaps have been gathered during a long period, and presented in a mass for the express purpose of producing forfeitures and imposing penalties. The statute has fixed the period of ten days as a reasonable one for that purpose. It is only when the refusal to pay the debt of the bank has continued for more than ten days that the proceedings can be instituted.

It is clear, too, that a continuance of such refusal beyond the period of ten days fixed in this section is not conclusive evidence that the bank is "insolvent" within the meaning of the statute. For, by section 8, the judge is to determine, "upon a hearing of the parties," whether the bank "be clearly solvent or otherwise." For that purpose he may require the officers of the bank "to exhibit any and all of its books, papers, accounts, assets, and effects, and to be examined on oath touching the same before him, or a referee to be appointed by him." By the next clause, it is provided that "if he determine that such corporation or association *is clearly solvent,* he shall, notwithstanding, continue the order for a temporary injunction, if one has been granted, until the demand of the applicant be fully paid, with his costs on such application; unless it shall have appeared, by affidavit

or otherwise, that such corporation or association have a good defence on the merits to such demand."

I deem it, therefore, clear that the judge may, upon the hearing, find upon the evidence, and determine that the bank is "clearly solvent," although it may have refused to pay a just demand against it for more than ten days; else, why was not the mere refusal to pay, for ten days, or for any other specified period, made conclusive evidence of insolvency? Why require the hearing of the parties, and the examination of the officers of the bank, and the investigation of its accounts, assets, and effects? Doubtless the fact of a refusal to pay the debt, if continued beyond the period of ten days, shifts the burden of proof on the question of insolvency from the applicant, and calls upon the bank to establish affirmatively that it is, within the language of the act, "clearly solvent." But that the bank may establish its solvency, even under such circumstances, is, as I have stated, clear from the terms of the statute.

The same conclusion would seem to follow from the decision of the Supreme Court and Court of Appeals in the case of the North American Trust & Banking Company. (See 17 *Barb.*, 309; opinion of Roosevelt, J., *Ib.*, 327; opinion of Mitchell, J., *Ib.*, 369; opinion of Edwards, J., *Ib.*, 374.) And see the opinion of Brown, J., in the same case in the Court of Appeals.

It is, however, neither necessary nor proper to pursue this inquiry further. The correctness of these views, upon which a temporary injunction was withheld, has not been seriously questioned; and the result of the hearing has evinced, in the clearest manner, the soundness and the propriety of their application.

The bank appears by its counsel, and affidavits are presented from its officers which deny that any debt is due from the bank to the applicant.

Unquestionably, the existence of a debt or liability against the corporation or association is the first requisite to the right to take these proceedings. It is only the "creditor" of the association, "having a demand exceeding one hundred dollars, arising upon a debt or liability, contracted after the first day of January (1850), the payment of which shall have been refused by such corporation or association," that can apply for an order declaring the corporation insolvent.

Ordinarily, the existence of the debt or liability will not be

denied, or, if denied, difficult to establish. The possession of the circulating notes of the bank, or of its pass-books containing credits for deposits, would enable the judge at a hearing to pass very speedily on the question of the existence of the debt against the bank.

It is, doubtless, for the benefit solely of creditors of the bank having demands against it, which are not to give rise to serious question, nor to occasion justifiable litigation, that this statutory proceeding was intended. If a moneyed institution admits the existence of the demand which its creditor presents against it, the law requires that the same shall be paid forthwith, or, at least, within the ten days given by the statute; and the failure to fulfil that duty exposes it to the penalties imposed by the statute. But when the refusal to pay arises not from unwillingness or inability, but from a just or well-founded belief that the debt is not owing at all, or, if due, is not due to the particular person claiming it as creditor, I can see no good ground for entertaining the proceedings under the seventh section of this act.

One of the purposes of the law is, as specified in its title, " to provide for the prompt payment of demands" against the banking corporations and associations of the State. But no such promptness in the payment of these demands is required, as shall prevent a full and fair investigation of all such as are doubtful, and the rejection of such as are unfounded. Unless every necessary facility for such an examination is given by this statute, it will, while it seeks to enforce the liabilities of stockholders in banks, " as prescribed by the constitution," run counter to certain other provisions of that instrument, which are as binding, and as necessary to be kept unimpaired, as those which define the liability of stockholders in banks.

This is not merely the dictate of good sense, and in accordance with the vested constitutional rights of banking institutions —it is the very language of the statute itself.

It is provided in the last clause of section 8, as already stated, that if the judge on the hearing determine that the association is clearly solvent, he shall, notwithstanding, continue the temporary injunction, if one has been granted, until the demand of the applicant be fully paid, with costs, "*unless it shall have appeared, by affidavit or otherwise, that such corporation or association have a good defence on the merits to such demand.*"

The moment that fact is established, the jurisdiction of the judge to entertain these particular proceedings, under section seven, is, in my opinion, wholly gone. For there are no means prescribed for passing upon the validity of the demand, or the sufficiency of a defence to it, in the course of these proceedings. The question which is designed to be tried, is that of the solvency or insolvency of the corporation or association refusing payment. There are no pleadings to present, by an issue either of fact or law, the questions out of which the debt or liability is to arise; there is not, and cannot be, any jury to try any such questions of fact; there is no court to determine such questions of law; for the original application is " to a justice of the Supreme Court." And the whole framework of the statute recognizes his decisions, opinions, and determinations as those, not of the *court* as such, but of " such judge."

And as there is no tribunal to try the questions either of fact or law, which would arise on such a disputed demand, so there is no provision for reviewing any decision upon such question. There could be no appeal, no writ of error, no review in any manner, except possibly by a *certiorari* from the judge sitting as a court, or several such judges thus sitting, to " the judge" who was fulfilling this statutory duty. That duty, too, is one which, when the proceedings are once regularly instituted, is clearly designed to be in a high degree summary : the first dividend being required to be paid by the receiver within ninety days from the time of his appointment, and the enlargement of that time which a justice of the Supreme Court may grant being carefully restricted to " a period not exceeding ninety days" (§ 12).

It would be as absurd as it is contrary to all the provisions of the statute, to hold that proceedings thus summary were to be suspended, while the existence of the debt, or the validity of an apparently good defence to it, were being tried and decided. And to press forward such proceedings, without establishing the debt, would be a mere wanton invasion of the constitutional rights of the debtor, tolerated only because that debtor was a corporation or association for banking purposes.

It may be urged that, by section 25 of this act, provision is made for appeals from the justice before whom the proceeding is pending. But it will be seen by a reference to that section,

that it refers only to appeals "from any determination or order of a justice of the Supreme Court, made pursuant to the fifth, sixth, seventh, eighth, and ninth sections of this act." And by examining these sections, it will appear that the only "determination" which the justice is to make must relate to the fact of solvency or insolvency; and the "orders" spoken of are those only which are preparatory to the decision on the question of solvency, or which follow, and give effect to, such a decision. None of these "determinations or orders" was meant to include what, if made, would have been equivalent to a final judgment in an action brought for the recovery of a disputed debt.

Beyond all doubt, the judge may, and must, look through any veil or disguise that may be interposed for the mere purpose of delay. He cannot decline to act merely because the defendants deny the existence of the debt. They must satisfy him affirmatively, by affidavit, or in some other manner equally effective, that they have a good defence to the demand of the applicant; and the facts constituting the defence must be set forth. But whenever the existence of such a defence is satisfactorily established, in my judgment, the proceedings taken under section 7, &c., must be dismissed.

These proceedings were not intended to afford the means of a speedy trial, or of a trial at all, of disputed demands against such institutions. There are provisions of the statute to which the holder of such a demand may resort, and under which he may obtain prompt relief.

By section 5 of the act, if a suit be brought against such an institution (as it may be forthwith after the refusal, the ten-days' limitation not applying to such a suit), "judgment *shall be rendered*" for such demand, with interest and costs, whether an answer has been served or not, "unless an order shall have been filed in the office of the clerk where such judgment might be entered, granted by a justice of the Supreme Court or county judge, that the entry of such judgment be stayed until the issue joined, or to be joined, by the parties, be disposed of. But no such order shall be granted without proof by affidavit to the satisfaction of such judge, that the defendant in such suit has a good defence on the merits to such demand, or some part thereof, arising upon facts set forth in such affidavits."

And, by section 6, upon the return of an execution against

the property of any such corporation or association, unsatisfied in whole or in part, or upon proof satisfactory to any justice of the Supreme Court, that any such execution, although not returned, cannot be satisfied out of any property of the defendant, he shall at once make an order declaring the insolvency of such corporation or association. By section 32, the proceedings in such suits are entitled to priority over all other causes in every court of the State, whether original or appellate, in which the same may be pending.

Certainly, with such provisions against delay from frivolous or technical defences, in suits against banking corporations or associations, there can be no occasion for assuming doubtful powers, or for extending, by any uncertain implications, the sweep of the remedies which the statute gives to their creditors.

It remains, therefore, only to inquire whether the defendants, in the present proceedings, "have a good defence on the merits" to the demand of the applicant.

It is clearly shown by the affidavits on the part of the defendants, and is not denied upon the other side, that the moneys in question were not deposited with this bank by the city of Brooklyn, or any of its officers ; and that the same were not, when deposited, the moneys of that city.

These moneys, it appears, were deposited with this bank in October, 1853, by John Berry, upon a contract which was contained in a receipt given therefor at the time, and of which the following is a copy :

"Received, Williamsburgh, 19th October, 1853, from John Berry, Esq., check on Broadway Bank for fourteen thousand six hundred ninety-four $\frac{6}{100}$ dollars, to be credited to the supervisor and town superintendent of the poor of the town of Williamsburgh.

MARTIN KALBFLEISCH,
For Mechanics' Bank of Williamsburgh."

The sum of money thus deposited is proved to be the share which belonged to the former town of Williamsburgh (which was set off from the town of Bushwick by chapter 51 of the Laws of 1840), upon an apportionment of the moneys which

arose from the sale of the town lands owned by the town of Bushwick prior to its division, and which, after such division, were sold pursuant to the provisions of 1 Revised Statutes, 338, §§ 4–8. For some reason not explained, these lands were not sold until March, 1851. On the 28th of that month, the supervisor and overseers of the poor of the town of Williamsburgh, which seems to have been at that time still recognized by law as a subsisting town, received from this source the sum of $13,460.82. On April 7, 1851, all that part of the county of Kings then "known as the *village* of Williamsburgh" was erected into the city of Williamsburgh. The *village* and the *town* of Williamsburgh had previously existed together, covering the same territory (*Laws of* 1840, 35, § 1). They seem to have had separate organizations, distinct officers, and diverse rights of property.

Although scarcely credible, it would seem to be true that the existence of the township, as distinguished from the village, has been for years overlooked in all the legislation which has been had on the subject of the village and city of Williamsburgh, and the consolidated city of Brooklyn. The town still subsists, unless its existence has been terminated, by implication, by the statutes since passed, erecting a city in its stead. At least it was asserted on the argument, by the defendant's counsel, that no direct provision of law had terminated the existence of the town, or transferred or merged its organization, or rights or property, in any other municipal corporation, whether the late village or city of Williamsburgh, or the present city of Brooklyn. This position was not controverted on the other side, and I have, therefore, not thought it necessary to examine particularly the mass of legislation under which the consolidated city of Brooklyn now exists. (See *Laws of* 1851, 161, § 10.) It was contended, however, on behalf of the applicants, that there could not be two such organizations coexisting, as the town and city of Williamsburgh, upon the same territory; and that this money must, therefore, by a necessary implication, have been vested in the city of Williamsburgh, when that was created, and thus is now vested in the city of Brooklyn. The town and village of Williamsburgh did, however, coexist for years upon the same territory. Neither the village, nor its successor, the city of Williamsburgh, ever attempted to assert a claim to these moneys or to reduce them to possession, so far as appears before me.

It is insisted for the defendants, with what force I shall not attempt here to determine, that nothing short of the omnipotence of the Legislature can dispose of this fund, and vest it in any individual or corporation, free from contending claims.

One thing, at least, is certain, that the ownership of the fund cannot be settled in *this* proceeding. The bank admit they owe the money ; but they are forbidden, by those from whom they received it, to pay it over to the city. They are advised by counsel that it cannot be safely paid over to the city, as such payment will not be a defence to the claim of the true owner, if there be one. And even if the legal title to the money be now in the city of Brooklyn, it is insisted that the city holds it merely as trustee for the persons who inhabit the territory which was formerly the town of Williamsburgh, and should take the fund only for the purpose of expending it for their benefit.

For aught that appears here, if the present applicant obtains this fund, it may be expended wholly for the benefit of the old city of Brooklyn, or the late town of Bushwick, and to the entire exclusion of the late town of Williamsburgh,—a result which no court or judge would allow, except for the most controlling reasons. If, therefore, any disposition is to be made of this fund by any judicial tribunal, all the parties in interest, or entitled to be heard upon the subject, must be brought before the court. There should be a regular statement of the rights of the claimants by orderly pleadings. Disputed questions, whether of law or fact, should be tried in the ordinary manner. The usual facilities for correcting any error, by a review upon appeal, should be open to all the parties ; and, above all, the question of the solvency or insolvency of this bank must be wholly disconnected from the suit that may be brought to try the title to this sum of money.

It is, therefore, my plain duty to grant a certificate that it sufficiently appears before me by affidavit that the association proceeded against have a good defence on the merits to the alleged demand of the applicant, and to direct that the proceedings be dismissed. An order must be entered accordingly.